**BURSOR & FISHER, P.A.**
Sarah N. Westcot (State Bar No. 264916)
701 Brickell Avenue, Suite 2100
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
Email: swestcot@bursor.com

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KOURTNEY RUSOW and T.S., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SKINSPIRIT ESSENTIAL LLC, SKINSPIRIT HOLDINGS LLC, and DEAN VISTNES M.D., INC.,<br><br>Defendants. | Case No. 3:24-cv-09317-CRB<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Kourtney Rusow and T.S. (collectively, "Plaintiffs") bring this class action complaint on behalf of themselves and all others similarly situated against Defendants SkinSpirit Essential LLC, SkinSpirit Holdings LLC, and Dean Vistnes M.D., Inc. (collectively, "SkinSpirit" or "Defendants"). Plaintiffs bring this action based upon personal knowledge of the facts pertaining to themselves, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all SkinSpirit patients who accessed https://www.skinspirit.com/ (the "Website"), to schedule a consultation for medical treatment and/or services.

2. Defendants operate "the premier destination for medical aesthetics and skincare"[1] Defendants provide an array of medical services and treatments to their patients, including various injectables, laser treatments, body contouring, and laser hair removal procedures. Defendants maintain an "expert staff of medical professionals" at each of its locations across more than a dozen states.[2]

3. When booking medical procedures online, patient privacy is crucial. Patients expect, as they should, that their information will be held in confidence and not shared with third parties without their knowledge or consent. The sensitive nature of information related to cosmetic medical procedures, such as those offered by Defendants, amplifies the need for privacy during online bookings. Medical procedures often involve deeply personal details about an individual's physical appearance, struggles with body image, and health history. This information can be emotionally charged and stigmatizing, making the protection of such data especially critical.

4. Moreover, information concerning an individual's healthcare, including medical procedures, is protected by state and federal law. Despite these protections, and unbeknownst to Plaintiffs and Class Members, Defendants aided, employed, agreed, and conspired with LinkedIn

---

[1] LINKEDIN, *SkinSpirit About*, https://www.linkedin.com/company/skinspirit-skincare-clinic-&-spa/about/.

[2] SKINSPIRIT, *Our Story*, https://www.skinspirit.com/skinspirit-company-story/.

and Google to intercept sensitive and confidential communications sent and received by Plaintiffs and Class Members, including communications containing protected medical information. Plaintiffs bring this action for legal and equitable remedies resulting from these illegal actions.

**PARTIES**

5. Plaintiff Rusow is an adult citizen of the state of California, domiciled in San Francisco, California.

6. Plaintiff Rusow has maintained a LinkedIn and Gmail account at all relevant times when booking her medical appointments on the Website. When creating her LinkedIn and Gmail accounts, Plaintiff Rusow was required to provide her full legal name, date of birth, and gender. Additionally, every time Plaintiff Rusow accesses her Gmail account, Google collects information related to her IP address and electronic device (e.g. browser, operating system, screen resolution, etc.) and stores it in a profile maintained by Google for targeted advertising purposes. Google also utilizes other features, such as generating specific user-IDs, to track its users across web browsing sessions for identification purposes, as detailed below.

7. Plaintiff Rusow has booked several medical appointments through the Website. Plaintiff Rusow attended her scheduled medical appointments and received medical treatment for the services she selected. For example, in or around May 12, 2023, Plaintiff Rusow navigated to Defendants' Website to book a medical consultation for Botox and laser treatment at Defendants' San Francisco Noe Valley location. During the booking process, Plaintiff Rusow selected the state she wished to book the appointment in, the type of procedure she was interested in, the specific procedure she wanted to have completed, the reason for the procedure, the provider she wished to see, the day, and time for her appointment. *See, e.g.,* Figures 2–6. Unbeknownst to Plaintiff Rusow, Defendants assisted LinkedIn and Google with intercepting her communications, including those that contained personally identifiable information ("PII"), protected health information ("PHI"), and related confidential information. Defendants assisted in these interceptions without Plaintiff Rusow's knowledge, consent, or express written authorization. As a consequence of these interceptions, Plaintiff Rusow has received advertisements marketing various cosmetic medical procedures, specifically targeted at Plaintiff Rusow as a result of Defendants' disclosure of her

medical booking information to LinkedIn and Google. Defendants breached their duties of confidentiality by unlawfully disclosing Plaintiff Rusow's PII and PHI. Due to the surreptitious nature of the interceptions at issue, Plaintiff Rusow did not realize that Defendants disclosed her PII and PHI to LinkedIn and Google until November 2024.

8. Plaintiff T.S. is an adult resident of the state of Washington, domiciled in Mountlake Terrace, Washington.

9. Plaintiff T.S. has maintained a LinkedIn and Gmail account at all relevant times when booking her medical appointments on the Website. When creating her LinkedIn and Gmail accounts, Plaintiff T.S. was required to provide her full legal name, date of birth, and gender. Additionally, every time Plaintiff T.S. accesses her Gmail account, Google collects information related to her IP address and electronic device (e.g. browser, operating system, screen resolution, etc.) and stores it in a profile maintained by Google for targeted advertising purposes. Google also utilizes other features, such as generating specific user-IDs, to track its users across web browsing sessions for identification purposes, as detailed below.

10. Plaintiff T.S. has booked several medical appointments through the Website. Plaintiff T.S. attended her scheduled medical appointments and received medical treatment for the services she selected. For example, in or around December 6, 2024, Plaintiff T.S. navigated to Defendants' Website to book a medical appointment for Derma Filler at Defendants' Bellevue Square location. During the booking process, Plaintiff T.S. selected the state she wished to book the appointment in, the type of procedure she was interested in, the specific procedure she wanted to have completed, the reason for the procedure, the provider she wished to see, the day, and time for her appointment. *See, e.g.,* Figures 2–6. Unbeknownst to Plaintiff T.S., Defendants assisted LinkedIn and Google with intercepting her communications, including those that contained PII, PHI, and related confidential information. Defendants assisted in these interceptions without Plaintiff T.S.'s knowledge, consent, or express written authorization. As a consequence of these interceptions, Plaintiff T.S. has received advertisements marketing various cosmetic medical procedures, specifically targeted at Plaintiff T.S. as a result of Defendants' disclosure of her medical booking information to LinkedIn and Google. Defendants breached their duties of

confidentiality by unlawfully disclosing Plaintiff T.S.'s PII and PHI. Due to the surreptitious nature of the interceptions at issue, Plaintiff T.S. did not realize that Defendants disclosed her PII and PHI to LinkedIn and Google until March 2025.

11. Defendant SkinSpirit Essential LLC is a Washington limited liability company with its principal place of business in Palo Alto, California. Defendant SkinSpirit Essential LLC owns and operates a national network of medical clinics specializing in a variety of cosmetic medical procedures. Defendant SkinSpirit Essential LLC maintains dozens of clinic locations in multiple states throughout the United States. Defendant SkinSpirit Essential LLC owns and operates the Website, whereby consumers seeking to procure medical procedures can schedule both virtual and in-person consultations for medical procedures, including at clinics located within California.

12. Defendant SkinSpirit Holdings LLC is a Delaware limited liability company. Defendant SkinSpirit Holdings LLC is the parent company of SkinSpirit Essential LLC. SkinSpirit Essential LLC is a wholly owned subsidiary of SkinSpirit Holdings LLC. As the parent company, Defendant SkinSpirit Holdings LLC exerts control over the operating decisions of its subsidiaries, including over the operation of the Website.

13. Defendant Dean Vistnes M.D., Inc. is a California corporation with its principal place of business in Seattle, Washington. Defendant Dean Vistnes M.D., Inc. is operated by M. Dean Vistnes, MD, who also serves as the full-time Medical Director of SkinSpirit. Defendant Dean Vistnes M.D., Inc. assists in the management of the medical professionals who provide medical services to SkinSpirit patients. Defendant SkinSpirit Essential LLC serves as a business associate of Defendant Dean Vistnes M.D., Inc.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511). This Court also has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367. Further, this action is a putative class action, and Plaintiffs allege that at least 100 people comprise the proposed class, that the combined claims of the proposed

class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from at least one defendant.

15. This Court has personal jurisdiction over the parties because the parties reside in California. Further, Defendants have, at all times relevant hereto, systematically and continually conducted business in California, including within this District, and intentionally availed themselves of the benefits and privileges of the California consumer market through the promotion, marketing, and sale of its services to residents within this District and throughout California

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants conduct business in this District and Defendants SkinSpirit Essential LLC and Defendant Dean Vistnes M.D., Inc. both have their principal place of business is in this District.

## FACTUAL ALLEGATIONS

### A. Background of the California Information Privacy Act

17. The California Information Privacy Act ("CIPA"), California Penal Code § 630, *et seq.*, prohibits aiding or permitting another person to willfully—and without the consent of all parties to a communication—read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received at any place within California.

18. To establish liability under California Penal Code § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*

> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

19. Section 631(a)'s applicability is not limited to phone lines, but also applies to "new technologies" including computers, the internet, and email. *See Matera v. Google Inc*., 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc*., 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history).

20. Under California Penal Code § 637.2, Plaintiff Rusow may seek injunctive relief and statutory damages of $5,000 per violation.

### B. Background of the California Confidentiality of Medical Information Act

21. Pursuant to the California Confidentiality of Medical Information Act ("CMIA"), a "provider of health care . . . shall not disclose medical information regarding a patient of the provider of health care . . . without first obtaining an authorization, except as provided in subdivision (b) or (c)." Cal. Civ. Code § 56.10(a). "An authorization for the release of medical information . . . shall be valid if it:

> (a) Is handwritten by the person who signs it or is in a typeface no smaller than 14-point type.
>
> (b) Is clearly separate from any other language present on the same page and is executed by a signature which serves no other purpose than to execute the authorization.
>
> (c) Is signed and dated . . .
>
> (d) States the specific uses and limitations on the types of medical information to be

disclosed.

(e) States the name or functions of the provider of health care, health care service plan, pharmaceutical company, or contractor that may disclose the medical information.

(f) States the name or functions of the persons or entities authorized to receive the medical information.

(g) States the specific uses and limitations on the use of the medical information by the persons or entities authorized to receive the medical information.

(h) States a specific date after which the provider of health care, health care service plan, pharmaceutical company, or contractor is no longer authorized to disclose the medical information.

(i) Advises the person signing the authorization of the right to receive a copy of the authorization."

Cal. Civ. Code § 56.11.

22. Moreover, a health care provider that maintains information for purposes covered by the CMIA is liable for negligent disclosures that arise as the result of an affirmative act—such as implementing a system that records and discloses online patients' personally identifiable information and protected health information. Cal. Civ. Code § 56.36(c).[3] Similarly, if a negligent release occurs and medical information concerning a patient is improperly viewed or otherwise accessed, the individual need not suffer actual damages. Cal. Civ. Code § 56.36(b).

> In addition to any other remedies available at law, any individual may bring an action against any person or entity who has negligently released confidential information or records concerning him or her in violation of this part, for either or both of the following: [¶] (1) ... nominal damages of one thousand dollars ($1,000). In order to recover under this paragraph, it shall not be necessary that the plaintiff suffered or was threatened with actual damages. [¶] (2) The amount of actual damages, if any, sustained by the patient.

*Sutter Health v. Superior Ct.*, 227 Cal. App. 4th 1546, 1551, 174 Cal. Rptr. 3d 653, 656 (2014) (quoting Cal. Civ. Code § 56.36(b)).

---

[3] "Every provider of health care . . . who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein. Any provider of health care ... who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Section 56.36." Cal. Civ. Code § 56.101, subd. (a).

### C. LinkedIn's Platform and its Business Tools

23. LinkedIn markets itself as "the world's largest professional network on the internet[.]"[4] But LinkedIn is no longer simply a tool to help users find jobs or expand their professional network. LinkedIn has moved into the marketing and advertising space and boasts of its ability to allow potential advertisers to "[r]each 1 billion+ professionals around the world" via its Marketing Solutions services.[5] Recently, LinkedIn was projected as being responsible for "roughly 0.9 percent of the global ad revenue" which included approximately $5.91 billion in advertising revenue in 2022.[6]

24. According to LinkedIn, "[t]argeting is a foundational element of running a successful advertising campaign — [g]etting your targeting right leads to higher engagement, and ultimately, higher conversion rates." [7] Targeting refers to ensuring that advertisements are targeted to, and appear in front of, the target demographic for an advertisement. To that end, LinkedIn's Marketing Solutions services allow potential advertisers to "[b]uild strategic campaigns" targeting specific users.[8] LinkedIn's "marketing solutions allow advertisers to select specific characteristics to help them reach their ideal audience. The ads [users] see on LinkedIn are then targeted to provide content relevant to [the users]."[9]

25. As a result of its activities and operation of the LinkedIn Insight Tag, LinkedIn is able to make extremely personal inferences about individuals' demographics, intent, behavior, engagement, interests, buying decisions, and more.[10]

---

[4] LINKEDIN, WHAT IS LINKEDIN AND HOW CAN I USE IT?, https://www.linkedin.com/help/linkedin/answer/a548441#.

[5] LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions.

[6] Valentina Dencheva, *LinkedIn annual ad revenue 2017-2027*, STATISTA (Dec. 12, 2023), https://www.statista.com/statistics/275933/linkedins-advertising-revenue.

[7] LINKEDIN, REACH YOUR AUDIENCE: TARGETING ON LINKEDIN, p.3, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/resources/pdfs/linkedin-targeting-playbook-v3.pdf.

[8] LINKEDIN, *supra* note 5.

[9] LINKEDIN, LINKEDIN ADS AND MARKETING SOLUTIONS, https://www.linkedin.com/help/lms/answer/a421454.

[10] *See* LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions/audience ("Target audiences through demographic marketing[,]" "Zero in on intent,

26. The personal information and communications obtained by LinkedIn are used to fuel various services offered via LinkedIn's Marketing Solutions including Ad Targeting, Matched Audiences, Audience Expansion, and LinkedIn Audience Network.[11]

27. Such information is extremely valuable to marketers and advertisers because the inferences derived from users' personal information and communications allows marketers and advertisers, including healthcare providers and insurance companies, to target potential customers.[12]

28. For example, through the use of LinkedIn's Audience Network, marketers and advertisers are able to expand their reach and advertise on sites other than LinkedIn to "reach millions of professionals across multiple touchpoints."[13] According to Broc Munro of Microsoft, "[w]e gravitate towards social platforms like LinkedIn to achieve more targeted marketing engagement. However, we know that our audiences don't spend all their time on social media. LinkedIn Audience Network enables us to expand our reach to trusted sites while still respecting our audience targeting. This increases the impact of our advertising."[14]

---

behavior, engagement, interests, and more[,]" and "Reach the LinkedIn audience involved in the buying decision").

[11] *See id.*

[12] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy ("We serve you tailored ads both on and off our Services. We offer you choices regarding personalized ads, but you cannot opt-out of seeing other ads."); LINKEDIN, ACCOUNT TARGETING, https://business.linkedin.com/marketing-solutions/ad-targeting ("Target your ideal customer based on traits like their job title, company name or industry, and by professional or personal interests"); LINKEDIN, EXAMPLES OF TRENDING AND BEST-IN-CLASS HEALTHCARE CAMPAIGNS AND CONTENT, p.6, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/healthcare-microsite/resources/lkin-lms-sales-healthcare-campaigns-trending-content-Jan2023.pdf ("BD zeroed in on the end-benefit with a 30 second video introducing their PIVO needle-free blood collection device to potential customers."); LINKEDIN, HEALTHCARE SOCIAL MEDIA STRATEGIES FOR 2023, p.1, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/healthcare-microsite/resources/hc-social-media-trends.pdf (listing "potential customers" as "Common audiences" for insurance sector).

[13] LINKEDIN, ACCOUNT TARGETING, https://business.linkedin.com/marketing-solutions/ad-targeting.

[14] LINKEDIN, LINKEDIN AUDIENCE NETWORK, https://business.linkedin.com/marketing-solutions/native-advertising/linkedin-audience-network.

29. In July 2022, "LinkedIn Marketing Solutions surpassed $5 billion in annual revenue[.]"[15] That figure is "expected to further grow to reach 10.35 billion U.S. dollars by 2027."[16]

30. According to LinkedIn, the LinkedIn Insight Tag is "[a] simple code snippet added to [a] website [that] can help you optimize your campaigns, retarget your website visitors, and learn more about your audiences."[17] LinkedIn represents that the LinkedIn Insight Tag "enable[s] in-depth campaign reporting and unlock[s] valuable insights about your website visitors."[18]

31. LinkedIn's current iteration of its Insight Tag is a JavaScript-based code which allows for the installation of its software.[19] A critical feature allows the LinkedIn Insight Tag to track users, even when third-party cookies are blocked.[20] LinkedIn "recommend[s] using the JavaScript-based Insight Tag or Conversions API" because third-party cookie settings are being deprecated across the industry.[21] Embedding the JavaScript as a first-party cookie causes users' browsers to treat the LinkedIn Insight Tag as though it is offered by the website being visited, rather than by LinkedIn. Doing so ensures that the third-party cookie-blocking functions of modern web browsers do not prevent LinkedIn from collecting data through its software.[22] Instead, the LinkedIn Insight Tag is shielded with the same privacy exemptions offered to first-party cookies.

---

[15] *LinkedIn Business Highlights from Microsoft's FY22 Q4 Earnings*, LINKEDIN PRESSROOM (July 25, 2022), https://news.linkedin.com/2022/july/linkedin-business-highlights-from-microsoft-s-fy22-q4earnings#:~:text=And%20LinkedIn%20Marketing%20Solutions%20surpassed,revenue%20for%20the%20first%20time.

[16] Dencheva, *supra* note 6.

[17] LINKEDIN, INSIGHT TAG, https://business.linkedin.com/marketing-solutions/insight-tag.

[18] LINKEDIN, LINKEDIN INSIGHT TAG FAQS, https://www.linkedin.com/help/lms/answer/a427660.

[19] LINKEDIN, *supra* note 17.

[20] *Id.* ("It's important for advertisers to prepare for these changes by switching to JavaScript tags and enabling 'enhanced conversion tracking' in the Insight Tag settings to continue capturing signals where 3rd party cookies are blocked.").

[21] *See id.*

[22] *See id.*

32. When a user who has signed in to LinkedIn (even if the user subsequently logs out) is browsing a website where the LinkedIn Insight Tag has been embedded, an HTTP request is sent using cookies, which includes information about the user's actions on the website.

33. These cookies also include data that differentiate users from one another and can be used to link the data collected to the user's LinkedIn profile.

34. The HTTP request about an individual who has previously signed into LinkedIn includes requests from the "li_sugr" and "lms_ads" cookies. Each of these cookies are used by LinkedIn "to identify LinkedIn Members off LinkedIn" for advertising purposes.[23]

35. For example, the "li_sugr" cookie is "[u]sed to make a probabilistic match of a user's identity."[24] Similarly, the "lms_ads" cookie is "[u]sed to identify LinkedIn Members off LinkedIn for advertising."[25]

36. A LinkedIn profile contains information including an individual's first and last name, place of work, contact information, and other personal details. Based on information it obtains through the LinkedIn Insight Tag, which Defendants installed on the Website, LinkedIn is able to target its account holders for advertising.

37. LinkedIn never receives consent from users to intercept and collect electronic communications containing their sensitive and unlawfully disclosed information. In fact, LinkedIn expressly warrants the opposite. Similarly, Defendants never receive consent from users to share information with LinkedIn.

38. When first signing up, a user agrees to the User Agreement.[26] By using or continuing to use LinkedIn's Services, users agree to two additional agreements: the Privacy Policy[27] and the Cookie Policy.[28]

---

[23] LINKEDIN, LINKEDIN COOKIE TABLE, https://www.linkedin.com/legal/l/cookie-table.

[24] *See id.*

[25] *See id.*

[26] LINKEDIN, USER AGREEMENT, https://www.linkedin.com/legal/user-agreement.

[27] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy.

[28] LINKEDIN, COOKIE POLICY, https://www.linkedin.com/legal/cookie-policy.

39. LinkedIn's Privacy Policy begins by stating that "LinkedIn's mission is to connect the world's professionals . . . . Central to this mission is our commitment to be transparent about the data we collect about you, how it is used and with whom it is shared."[29]

40. The Privacy Policy goes on to describe what data LinkedIn collects from various sources, including cookies and similar technologies.[30] LinkedIn states "we use cookies and similar technologies (e.g., pixels and ad tags) to collect data (e.g., device IDs) to recognize you and your device(s) on, off and across different services and devices where you have engaged with our Services. We also allow some others to use cookies as described in our Cookie Policy."[31]

41. However, LinkedIn offers an express representation: "**We will only collect and process personal data about you where we have lawful bases.**"[32]

42. Users never choose to provide sensitive information to LinkedIn because, among other reasons, they never know whether a particular website uses the LinkedIn Insight Tag, and, if so, what sensitive personal data it collects.

**D. Google's Advertising Technology**

43. Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications. Each device (such as a computer, tablet, laptop, or smartphone) accesses web content through a web browser (e.g. Chrome, Safari, Edge, etc.).

44. Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with the consumer's device via web browsers.

45. Web communications consist of HTTP Requests and HTTP Responses and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

a. HTTP Request: an electronic communication sent from a device's browser to

---

[29] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy.

[30] *Id.*

[31] *Id.*

[32] *Id.* (emphasis added).

the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

b. Cookies: a small text file that can be used to store information on the device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

c. HTTP Response: an electronic communication that is sent as a reply to the device's web browser from the host server in response to a HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

46. A consumers' HTTP Request essentially asks the Website to retrieve certain information (such as appointment booking information), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the consumer's screen as they navigate the Website).

47. Every website is comprised of Markup and "Source Code." Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

48. Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. The tracking technologies embedded on the Website by Defendants constitute Source Code and function is a substantially similar way.

49. Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $1 trillion dollars. Google fancies itself a "tech" company, but Google, at its core, is an advertising company.

50. Google "make[s] money" from "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising."[33] In 2020, Google generated $146.9 billion in advertising revenue, which

[33] ALPHABET INC., ANNUAL REPORT (FORM 10-K) (Feb. 2, 2021), available at https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

amounted to more than 80 percent of Google's total revenues for the year. Google generated an even higher percentage of its total revenues from advertising in prior years:

**Figure 1:**

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|---|---|---|---|
| 2021 | $257.6 billion | $209.5 | 81.33% |
| 2020 | $182.5 billion | $146.9 billion | 80.49% |
| 2019 | $161.9 billion | $134.8 billion | 83.29% |
| 2018 | $136.8 billion | $116.5 billion | 85.12% |

51. Google offers several analytics products, including SDKs and a tracking pixel, which exist solely to help drive ad revenue. For instance, Google's SDK and pixel integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue. Products like Google's SDK and its tracking pixel also improve the company's advertising network and capabilities by providing more wholesome profiles and data points on individuals.

52. One of these SDKs and tracking pixels is Google Analytics. Google first launched a version of Google Analytics in 2005 as a tool for website traffic analysis. In 2007, Google launched Google Analytics Synchronous code with new tracking functionality, such as the ability to track commerce transactions. Two years later, Google launched the Google Analytics Asynchronous code, which allowed webpages to load faster and improved data collection and accuracy.

53. Google continued updating its analytics platform, launching Universal Analytics in 2012. Universal Analytics offered new tracking codes and tools that provided more in-depth information about user behavior. Also, Universal Analytics enabled tracking the same user across multiple devices through its addition of the User-ID feature, which "associate[s] a persistent ID for a single user with that user's engagement data from one or more sessions initiated from one or more devices."

54. In 2020, Google launched Google Analytics 4, a platform combining Google Analytics with Firebase to analyze both app and web activity.

55. Since launching Google Analytics, Google has become one of the most popular web analytics platforms on the internet. Indeed, Google had a $62.6 billion increase in advertising revenues in 2021, compared to 2020, after launching its most recent version of Google Analytics.

56. Google touts Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms."[34] It allows companies and advertisers that utilize it to "understand how your customers interact across your sites and apps, throughout their entire lifestyle," "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data," "take action to optimize marketing performance with integrations across Google's advertising and publisher tools," and "quickly analyze your data and collaborate with an easy-to-use interface and shareable reports."[35]

57. Google Analytics is incorporated into third-party websites and apps, including the Website, by adding a small piece of JavaScript measurement code to each page on the site—even when SkinSpirit users are logged into their account portals. This code immediately intercepts a user's interaction with the webpage every time the user visits it, including what pages they visit and what they click on. The code also collects PII, such as IP addresses and device information related to the specific computing device a consumer (or patient) is using to access a website. The device information intercepted by Google includes the patient's operating system, operating system version, browser, language, and screen resolution.

58. In other words, when interacting with the Website, an HTTP Request is sent to SkinSpirit's server, and that server sends an HTTP Response including the Markup that displays the website visible to the patient and Source Code, including Google's tracking technologies.

59. Thus, Defendants are essentially handing their patients a tapped device, and once the webpage is loaded onto the patient's browser, the software-based wiretap is quietly waiting for private communications on the Website to trigger the tap, which intercepts those communications intended only for Defendants and transmits those communications to third parties like Google.

---

[34] *Analytics*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last visited Jan. 10, 2023).

[35] *Id.*

60. Once Google's software code collects the data intercepted from the Website, it packages the information and sends it to Google Analytics for processing. Google Analytics enables the company or advertiser to customize the processing of the data, such as applying filters. Once the data is processed, it is stored on a Google Analytics database and cannot be changed.

61. After the data has been processed and stored in the database, Google uses this data to generate reports to help analyze the data from the webpages. These include reports on acquisition (e.g., information about where your traffic originates, the methods by which users arrive at your site or app, and the marketing efforts you use to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits, and demographics (e.g., classify your users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities).

62. In addition to using the data collected through Google Analytics to provide marketing and analytics services, Google also uses the data collected through Google Analytics to improve its ad targeting capabilities and data points on users.

63. Google Analytics links with Google Ads so that Google may use the data intercepted by Google Analytics to be utilized for targeted advertising purposes.[36] Such practices were in effect on the SkinSpirit Website at all relevant times.

64. The Website utilizes Google's pixel and SDK. As a result, Google intercepted patients' interactions on the Website, including their PII and PHI. Google received at least "Custom Events" and URLs that disclosed the Botox treatment being received by the patient. Google also received additional PII, including the patients' IP address, device information, and User-IDs.

65. For example, the Website utilizes Google's "cid" or "Client ID" function to identify users as they navigate the SkinSpirit Website.[37]

---

[36] https://support.google.com/analytics/answer/9379420?hl=en#zippy=%2Cin-this-article

[37] https://www.owox.com/blog/use-cases/google-analytics-client-id#:~:text=The%20Client%20ID%20(cid)%20or,unique%20users%20using%20this%20parameter.

66. In addition to user-IDs, upon receiving information from the Website, Google also utilizes a "browser-fingerprint" to personally identify consumers. A browser-fingerprint is information collected about a computing device that is used to identify the specific device.

67. These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data.

68. As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[38]

69. The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[39] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

70. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[40]

71. Browser-fingerprints are personal identifiers. Tracking technologies, like the ones developed by Google and utilized on the Website, can collect browser-fingerprints from website visitors.

72. As enabled by Defendants, Google collects vast quantities of consumer data through its tracking technology.

73. Due to the vast network of consumer information held by Google, it is able to match the IP addresses, device information, and user-IDs it intercepts and link such information to an individual's specific identity.

---

[38] https://www.blog.google/products/chrome/building-a-more-private-web/

[39] https://www.pixelprivacy.com/resources/browser-fingerprinting/

[40] https://ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/

74. Google then utilizes such information for its own purposes, such as targeted advertising.

### E. Defendants Disclosed Plaintiffs' and Class Members' Protected Health Information

75. Botox treatment is surging in popularity. In 2022, the global Botox industry was valued at over $6 billion.[41] By 2030, the global market is expected to exceed $15 billion.

76. The cosmetic treatments and services offered by Defendants are recognized as medical procedures in both California[42] and Washington[43].

77. Defendants' patients access the Website to book consultations and appointments for various medical procedures.

78. When accessing the Website, patients are required to create an account in order to schedule their medical appointments.




**Figure 2:** Screenshot of Defendants' Website with pixel interceptions overlayed (confirmable with developer tools)

[41] Botox Market Growth, Values, Analysis [2030] | The Brainy Insights

[42] https://facialesthetics.org/california-botox-training-requirements/#:~:text=In%20California%2C%20obtaining%20Botox%20certification,are%20classified%20as%20medical%20procedures. ("In California, obtaining Botox certification is essential for medical professionals who wish to legally administer Botox or other botulinum toxins, as these treatments are classified as medical procedures.").

[43] *See* Wash. Admin. Codes §§ 246-836-212 and 246-919-606.




**Figure 3**: Screenshot of Defendants' Website with pixel interceptions overlayed (confirmable with developer tools)

79. After creating their accounts, patients click a book now button on the Website, which allows them to pick which state they would like to book their consultation in. *See* Figures 2-3.

80. Unbeknownst to SkinSpirit's patients, LinkedIn and Google were tracking their activity the moment they entered the Defendants' Website.

81. For example, Defendants embedded the LinkedIn Insight Tag on the Website, which allowed LinkedIn to intercept and record "click" events. Click events detail information about which page on the Website the patient was viewing as well as the selections they were making. LinkedIn intercepts information including the state the patient is booking the appointment in, the type of procedure they were interested in, the specific procedure they wanted to have completed, the reason for the procedure, the provider they wished to see, the day, and time for the patient's appointment. *See* Figures 2–6.




**Figure 4:** Screenshot of Defendants' Website with pixel interceptions overlayed (confirmable with developer tools)




**Figure 5:** Screenshot of Defendants' Website with pixel interceptions overlayed (confirmable with developer tools)




**Figure 6:** Screenshot of Defendants' Website with pixel interceptions overlayed (confirmable with developer tools)

82. By installing the LinkedIn Insight Tag on the Website, Defendants disclosed its patients PII and PHI to LinkedIn related to their medical appointments in order to monetize that data for targeted advertising

83. As shown in Figures 3 through 6, LinkedIn intercepts several pieces of confidential information, including the state the appointment is in, the type of procedure a patient is interested in, the specific procedure they want completed, the reason for the procedure, the provider they wish to see, the day, and time for the appointment.

84. These interceptions also included the li_sugr and lms_ads cookies, which LinkedIn utilizes to identify its account holders for targeted advertising.

85. LinkedIn incorporated the information it intercepted from Defendants' Website into its marketing tools to fuel its targeted advertising service.

86. Similarly, during the appointment booking process, Defendants disclosed their patients' PII and PHI to Google as well:


Query String Parameters view source view URL-encoded
v: 2
tid: G-TPX9GJNM6C
gtm: 45je4ae0v9118221732za200
_p: 1729095915154
gcd: 131313131111
npa: 0
dma: 0
tag_exp: 101686685
gdid: dZTQ1Zm
cid: 1097504560.1729095915
ul: en-us
sr: 3072x1728
uaa: x86
uab: 64
uafvl: Google%20Chrome;129.0.6668.103|Not%3DA%3FBrand;8.0.0.0|Chromium;129.0.6668.103
uamb: 0
uam:
uap: Windows
uapv: 15.0.0
uaw: 0
are: 1
pae: 1
frm: 0
pscdl: noapi
_s: 6
cu: USD
sid: 1729095915
sct: 1
seg: 1
dl: https://skinspirit.zenoti.com/webstoreNew/services/928596c7-6929-44de-be94-e500ebb50e06?fx_sid=a39393de-b12a-4a27-a338-506ca5248202&fx_uid=
87ede7a-7a3d-4b10-9aa2-8e7225bdfb63&fx_gaId=GA1.1.252323256.1729095874&fx_s=direct&fx_m=direct&__hstc=220057542.93a7792c76329247bcd7c3249dee8a
c.1729095864719.1729095864719.1729095864719.1&__hssc=220057542.4.1729095864719&__hsfp=1896627464&_gl=1*1ogfklu*_gcl_au*MjA5MDgxNzI0Ny4xNzIzNDA
Njc0LjM3ODAzOTk3MS4xNzI3NzMyMjkyLjE3Mjc3MzIyOTI.*_ga*MTI0MzU5NzQ5Mi4xNzAwNjg1NzEw*_ga_TPX9GJNM6C*MTcyODg0MTEwNi4xNDUuMS4xNzI4ODQzMjQ4LjU2LjAuM
A..
dr: https://www.skinspirit.com/
dt: skinspirit - Online Booking - Services - Booking Summary
en: purchase
_c: 1
_ee: 1
pr1: id993915a7-c537-4963-9bbb-08803f746b40~nmBotox Hyperhidrosis 100 Units~lp1~qt1~pr1475
ep.transaction_id: 68e00e2c-8130-429e-a14a-fe9edc5c3f73
ep.affiliation: Webstore Store - Online
ep.value: 1475.00
ep.tax: 0.00
epn.shipping: 0
ep.center_id: 928596c7-6929-44de-be94-e500ebb50e06
ep.center_name: Los Gatos
ep.is_new_guest: true
_et: 2223
tfd: 156689


**Figure 7:** Screenshot of information intercepted through Google's tracking technologies on Defendants' Website (confirmable with developer tools)

87. When patients' book a medical appointment for Botox treatment, Defendants intercept information related to their patients' appointments through Google's tracking

technologies, including the city the appointment is in, the type of procedure a patient is interested in, the specific procedure they want completed, the reason for the procedure.

88. Defendants further disclose to Google the PII of their patients' sufficient for Google to uncover their identities. In the HTTP communications shown in Figure 7, the patients' IP address is inherently included in every network request. In addition to their patients' IP address, Defendants, through Google's tracking technologies, disclosed information about their specific devices and user-IDs to Google, allowing Google to link such information to an individual's specific identity.

89. As shown and described above, Plaintiffs' communications with Defendants were disclosed by Defendants to Google and/or intercepted in transit by Google, in real time, via detailed URLs, which contain the medically sensitive information entered into the Website.

90. Defendants also use and cause the disclosure of data sufficient for Google to create a browser-fingerprint identifier with each re-directed communication described herein, including patient communications concerning individual medical appointments.

91. Defendants sent out these identifiers (e.g. cid, IP address, and device information) with each patient's "event" data.

92. Plaintiffs never consented, agreed, authorized, or otherwise permitted LinkedIn or Google to intercept her confidential health information.

93. Plaintiffs never consented, agreed, authorized, or otherwise permitted Defendants to share her confidential health information. Such disclosures are an invasion of privacy, lead to harassing targeted advertising, and violate federal and state law.

By law, Plaintiffs are entitled to privacy in their protected health information and confidential communications. Defendants deprived Plaintiffs of their privacy rights when they implemented a system that surreptitiously tracked and recorded Plaintiff's and other online consumers' confidential communications, personally identifiable information, and protected health information.

### F. Warning on Tracking Codes on Health Care Websites

94. The federal government has issued guidance warning that tracking codes like the LinkedIn Insight Tag may violate federal privacy law when installed on healthcare websites such as Defendant's. The statement titled, USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES (the "Bulletin"), was issued by the Department of Health and Human Services' Office for Civil Rights ("OCR") in December 2022.[44]

95. Healthcare organizations regulated under the Health Insurance Portability and Accountability Act (HIPAA) may use third-party tracking tools, such as the LinkedIn Insight Tag, in a limited way, to perform analysis on data key to operations. They are not permitted, however, to use these tools in a way that may expose patients' PHI to these vendors. The Bulletin explains:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures***.[45]

96. The bulletin discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, ***discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI***. Such disclosures can reveal incredibly sensitive information about an individual, ***including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment***. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more***

[44] HHS.gov, USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

[45] *Id.* (Emphasis added).

> ***than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.***[46]

97. Plaintiff and Class members face the risks about which the government expresses concern. Defendant disclosed the fact that Plaintiff's and Class members' booked body contouring medical procedures on Defendant's Website, which in turn also discloses the health conditions for which they seek a health care provider; the frequency with which they take steps relating to body image; and where they seek medical treatment. This information is, as described by the OCR in its bulletin, "highly sensitive."

98. The Bulletin goes on to make clear how broad the government's view of protected information is. It explains:

> This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, ***or any unique identifying code***.[47]

99. Crucially, that paragraph in the government's Bulletin continues:

> ***All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services.*** This is because, ***when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care***.[48]

100. Then, in July 2022, the Federal Trade Commission ("FTC") and the Department of Health and Human Services ("HHS") issued a joint press release warning regulated entities about the privacy and security risks arising from the use of online tracking technologies:

> The Federal Trade Commission and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) are cautioning hospitals and telehealth providers [regulated entities] about the privacy and security risks related to the use of

---

[46] *Id.* (Emphasis added).

[47] *Id*. (Emphasis added).

[48] *Id*. (Emphasis added).

online tracking technologies integrated into their websites or mobile apps that may be impermissibly disclosing consumers' sensitive personal health data to third parties.

"When consumers visit a hospital's [regulated entity's] website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties," said Samuel Levine, Director of the FTC's Bureau of Consumer Protection. "The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue doing everything in our powers to protect consumers' health information from potential misuse and exploitation."

"Although online tracking technologies can be used for beneficial purposes, patients and others should not have to sacrifice the privacy of their health information when using a hospital's [regulated entity's] website," said Melanie Fontes Rainer, OCR Director. "OCR continues to be concerned about impermissible disclosures of health information to third parties and will use all of its resources to address this issue."

The two agencies sent the joint letter to approximately 130 [regulated entities] hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies gather identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app.

In their letter, both agencies reiterated the risks posed by the unauthorized disclosure of an individual's personal health information to third parties. For example, the disclosure of such information could reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment.

. . . Through its recent enforcement actions against BetterHelp, GoodRx and Premom, as well as recent guidance from the FTC's Office of Technology, the FTC has put companies on notice that they must monitor the flow of health information to third parties that use tracking technologies integrated into websites and apps. The unauthorized disclosure of such information may violate the FTC Act and could constitute a breach of security under the FTC's Health Breach Notification Rule . . . .[49]

---

[49] FEDERAL TRADE COMMISSION, FTC AND HHS WARN HOSPITAL SYSTEMS AND TELEHEALTH PROVIDERS ABOUT PRIVACY AND SECURITY RISKS FROM ONLINE TRACKING TECHNOLOGIES, July 20, 2023, https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking.

101. The FTC is unequivocal in its stance. The FTC has specifically informed healthcare companies, like Defendants, that they should not use tracking technologies to collect sensitive health information and disclose it to third party advertising platforms without informed consent:

> The FTC Act prohibits companies and individuals from engaging in unfair or deceptive acts or practices in or affecting commerce. This means you must ensure your health data practices aren't substantially injuring consumers, including by invading their privacy.
>
> For instance, *BetterHelp*, *GoodRx*, and *Premom* make clear that disclosing consumers' health information for advertising without their affirmative express consent may be an unfair practice.
>
> [I]f you use behind-the-scenes tracking technologies that share consumers' sensitive health data in contradiction of your privacy promises, that's a violation of the FTC Act.[50]

102. Therefore, Defendant's conduct is directly contrary to clear pronouncements by the FTC and HHS.

103. In light of, and in addition to, the federal government's own issued guidance above, news sources also warn that tracking code, like the LinkedIn Insight Tag, poses risks of violating federal privacy law and HIPAA:

> Federal regulators are warning [regulated entities] hospital systems and telehealth providers about the data privacy risks of using third-party tracking technologies.
>
> These services, like [LinkedIn Insight Tag] or Google Analytics, could violate the Health Insurance Portability and Accountability Act (HIPAA) or Federal Trade Commission (FTC) data security rules, officials said.
>
> The FTC and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) issued a rare joint release announcing that 130 [regulated entities] hospital systems and telehealth providers received a letter warning them about the data privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps … "The compliance buck still stops with you. Furthermore, your company is legally responsible even if you don't use the data obtained through tracking technologies for marketing purposes."[51]

---

[50] https://www.ftc.gov/business-guidance/resources/collecting-using-or-sharing-consumer-health-information-look-hipaa-ftc-act-health-breach

[51] Heather Landi, *Regulators warn hospitals and telehealth companies about privacy risks of Meta, Google tracking tech*, FIERCE HEALTHCARE, July 21, 2023, https://www.fiercehealthcare.com/health-tech/regulators-warn-hospitals-and-telehealth-companies-about-privacy-risks-meta-google.

104. Fierce Healthcare also spoke up in an April 3, 2023 article:

> Nearly all nonfederal acute care hospitals' [regulated entities'] websites track and transfer data to a third party, potentially fueling the unwanted disclosures of patients' sensitive health information and opening up that [regulated entity] hospital to legal liability, according to a recently published University of Pennsylvania analysis. [https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2022.01205]. The census of more than 3,700 hospital [regulated entity] homepages found at least one third-party data transfer among 98.6% of the websites as well as at least one third-party cookie on 94.3%, researchers wrote in Health Affairs.
>
> The hospitals' [regulated entities'] homepages had a median of 16 third-party transfers, more of which were found among medium-sized (100 to 499 beds) hospitals, nonprofit hospitals, urban hospitals, health system-affiliated hospitals and those that weren't serving the largest portion of patients in poverty, they wrote … Many of these complaints cite Facebook parent company Meta's Pixel tracker, which a June 2022 investigation from The Markup [https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites] detected on about a third of large hospitals' websites. That report found evidence that, in some instances, the sensitive data transferred to third parties met the criteria for a HIPAA violation.[52]

105. Health Affairs also published an article in April 2023, stating:

> By including third-party tracking code on their websites, hospitals [regulated entities] are facilitating the profiling of their patients by third parties. These practices can lead to dignitary harms, which occur when third parties gain access to sensitive health information that a person would not wish to share. These practices may also lead to increased health-related advertising that targets patients, as well as to legal liability for hospitals [regulated entities].[53]

106. This is further evidence that the data that Defendant chose to share is protected PHI and PII. The sharing of that information was a violation of Class members' rights.

**G. Tolling**

107. Any applicable statutes of limitations have been tolled by Defendants' knowing and active concealment of its incorporation of the LinkedIn Insight Tag and Google tracking technologies onto the SkinSpirit Website.

---

[52] Dave Muoio, *Almost every hospital's homepage is sending visitors' data to third parties, study finds*, FIERCE HEALTHCARE, Apr. 3, 2023, https://www.fiercehealthcare.com/providers/almost-every-hospital-homepage-sending-visitors-data-third-parties-study-finds.

[53] Ari B. Friedman, et al., *Widespread Third-Party Tracking On Hospital Websites Poses Privacy Risks For Patients And Legal Liability For Hospitals*, HEALTH AFFAIRS, Vol. 42, No. 24, April 2023, https://www.healthaffairs.org/doi/10.1377/hlthaff.2022.01205.

108. The LinkedIn Insight Tag and Google tracking technologies are entirely invisible to a website visitor.

109. Through no fault or lack of diligence, Plaintiffs and members of the putative classes were deceived and could not reasonably discover Defendants' deceptive and unlawful conduct.

110. Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

111. Defendants had exclusive knowledge that the SkinSpirit Website incorporated the LinkedIn Insight Tag and Google tracking technologies and yet failed to disclose to their patients, including Plaintiffs, that by scheduling medical appointments through the Website, their PHI and PII would be disclosed to LinkedIn and Google.

112. Under the circumstances, Defendants were under a duty to disclose the nature, significance, and consequences of its collection and treatment of its patients PII and PHI. In fact, to the present, Defendants have not conceded, acknowledged, or otherwise indicated to their patients that they have disclosed or released their PII or PHI to unauthorized third parties. Accordingly, Defendants are estopped from relying on any statute of limitations.

113. Moreover, all applicable statutes of limitations have also been tolled pursuant to the discovery rule.

114. The earliest that Plaintiffs, acting with due diligence, could have reasonably discovered Defendants' conduct would have been shortly before the filing of the initial complaint in this matter.

## CLASS ACTION ALLEGATIONS

115. Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of a class defined as all natural persons in the United States who, during the class period, had a LinkedIn or Gmail account and booked an appointment on the Website (the "Class").

116. Plaintiff Rusow also brings this action on behalf of a subclass defined as all natural persons in California who, during the class period, had a LinkedIn or Gmail account and booked an appointment on the Website (the "California Subclass").

117. Plaintiff T.S. also brings this action on behalf of a subclass defined as all natural persons in Washington who, during the class period, had a LinkedIn or Gmail account and booked an appointment on the Website (the "Washington Subclass")(together with the Class and the California Subclass, the "Classes").

118. Subject to additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

119. The "Class Period" is the time beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

120. Excluded from the Classes are Defendants; any affiliate, parent, or subsidiary of Defendants; any entity in which Defendants have a controlling interest; any officer, director, or employee of Defendants; any successor or assign of Defendants; anyone employed by counsel in this action; any judge to whom this case is assigned, his/her spouse and immediate family members; and members of the judge's staff.

121. Numerosity. Members of the Classes are so numerous that joinder of all members is impracticable. The exact number of Class Members is unknown to Plaintiffs at this time; however, it is estimated that there are at least thousands of individuals in the Classes. The identity of such membership is readily ascertainable from Defendants' records.

122. Typicality. Plaintiffs' claims are typical of the claims of the Classes because Plaintiffs used the Website to schedule a medical appointment and had her personally identifiable information and protected health information disclosed to LinkedIn and Google without their express written authorization or knowledge. Plaintiffs' claims are based on the same legal theories as the claims of other Class members.

123. Adequacy. Plaintiffs are prepared to take all necessary steps to represent fairly and adequately the interests of the Class members. Plaintiffs' interests are coincident with, and not antagonistic to, those of the members of the Classes. Plaintiffs are represented by attorneys with experience in the prosecution of class action litigation, generally, and in the emerging field of

digital privacy litigation, specifically. Plaintiffs' attorneys are committed to vigorously prosecuting this action on behalf of the members of the Classes.

124. Commonality. Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual members of the Classes because Defendants have acted on grounds generally applicable to the Classes. Such generally applicable conduct is inherent in Defendants' wrongful conduct. Questions of law and fact common to the Classes include:

a. Whether Defendants intentionally tapped the lines of internet communication between patients and their healthcare provider;

b. Whether the Website surreptitiously recorded personally identifiable information, protected health information, and related communications and subsequently, or simultaneously, disclosed that information to LinkedIn and/or Google;

c. Whether LinkedIn and Google are third-party eavesdroppers;

d. Whether Defendants' disclosures of personally identifiable information, protected health information, and related communications constituted an affirmative act of communication;

e. Whether Defendants' conduct, which allowed LinkedIn and Google—each an unauthorized person—to view Plaintiffs' and Class members' personally identifiable information and protected health information, resulted in a breach of confidentiality;

f. Whether Defendants violated Plaintiffs' and Class members' privacy rights by using the LinkedIn Insight Tag and Google tracking technologies to record and communicate patients' confidential medical communications;

g. Whether Plaintiffs and Class members are entitled to damages under the ECPA, CIPA, the CMIA, or any other relevant statute; and

h. Whether Defendants' actions violated Plaintiffs' and Class members' privacy rights as provided by the California Constitution.

125. Superiority. Class action treatment is the superior method for the fair and efficient adjudication of this controversy. Such treatment permits a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh any potential difficulties in the management of this class action. Plaintiffs know of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2511(1)

126. Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Class.

127. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

128. The ECPA protects both sending and the receipt of communications.

129. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

130. The transmission of Plaintiffs' private and confidential information to Defendants' Website qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

131. The transmission of the private and confidential information between Plaintiffs and Class members and Defendants' Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that

affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

132. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

133. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

134. The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5).

135. The following instruments constitute "devices" within the meaning of the ECPA:

a. The computer codes and programs LinkedIn and Google used to track Plaintiffs and Class members communications while they were navigating the Website;

b. Plaintiffs' and Class members' browsers;

c. Plaintiffs' and Class members' mobile devices;

d. Defendants, LinkedIn's, and Google's web and ad servers;

e. The plan Defendants, LinkedIn, and Google carried out to effectuate the tracking and interception of Plaintiffs' and Class members' communications while they were using a web browser to navigate the Website.

136. Plaintiffs and Class members' interactions with Defendants' Website are electronic communications under the ECPA.

137. By utilizing and embedding the LinkedIn Insight Tag and Google tracking technologies on its Website, Defendants intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiffs and Class members in violation of 18 U.S.C. § 2511(1)(a).

138. Specifically, Defendants intercepted Plaintiffs' and Class members' electronic communications through the LinkedIn Insight Tag and Google tracking technologies, which

tracked, stored and unlawfully disclosed Plaintiffs' and Class members' private and confidential information to third parties, such as LinkedIn and Google.

139. Defendants intercepted or assisted in the interception of communications that include, but are not necessarily limited to, communications to/from Plaintiffs and Class members regarding private and confidential information, including their LinkedIn and Gmail accounts, and treatment information. This confidential information was then monetized for targeted advertising purposes.

140. By intentionally disclosing or endeavoring to disclose Plaintiffs' and Class members' electronic communications to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(c).

141. By intentionally using, or endeavoring to use, the contents of Plaintiffs' and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(d).

142. Defendants intentionally intercepted or intentionally assisted in the interception of the contents of Plaintiffs' and Class members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, among others.

143. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, as alleged above, Defendant violated a provision of the Health Insurance Portability and Accountability Act, specifically 42 U.S.C. § 1320d-6(a)(3), as well as the FTC Act and the CMIA. 42 U.S.C. § 1320d-6(a)(3) imposes a criminal penalty for knowingly disclosing individually identifiable health information ("IIHI") to a third party. HIPAA defines IIHI as:

any information, including demographic information collected from an individual,

> that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.[54]

144. Plaintiffs' information that Defendants disclosed to LinkedIn and Google qualifies as IIHI and PHI, and Defendants violated Plaintiffs' and Class members' expectations of privacy. Such conduct constitutes tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d-6. Defendants used the wire or electronic communications to increase their profit margins. Defendants specifically used the LinkedIn Insight Tag and Google tracking technologies to track and utilize Plaintiffs' and Class members' private and confidential information for financial gain.

145. Defendants were not acting under the color of law to intercept Plaintiffs' and Class members' wire or electronic communications.

146. Plaintiffs and Class members did not authorize Defendants to acquire the content of their communications for purposes of invading Plaintiffs' and Class members' privacy through the LinkedIn Insight Tag and Google tracking technologies. Plaintiffs and Class members had a reasonable expectation that Defendants would not intercept or assist in the interception of their private and confidential information without their knowledge or consent.

147. The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq.*

148. As a result of each and every violation thereof, on behalf of themselves and the Class, Plaintiffs seek statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510, *et seq.* under 18 U.S.C. § 2520.

---

[54] 42 U.S.C. § 1320d-6.

**COUNT II**
**Violation of the California Invasion of Privacy Act,**
**Cal. Penal Code § 631**

149. Plaintiff Rusow repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the California Subclass.

150. The California Invasion of Privacy Act ("CIPA") is codified at California Penal Code sections 630 to 638. CIPA begins with its statement of purpose – namely, that the purpose of CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . ." Cal. Penal Code § 630.

151. A person violates California Penal Code § 631(a), if:

> by means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . . .

Cal. Penal Code § 631(a).

152. Further, a person violates Section 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph. *Id.*

153. To avoid liability under Section 631(a), a defendant must show it had the consent of **<u>all</u>** parties to a communication.

154. At all relevant times, Defendants aided, agreed with, and conspired with LinkedIn and Google to track and intercept Plaintiff Rusow's and Class members' internet communications

while accessing the Website. These communications were intercepted without the authorization and consent of Plaintiff Rusow and Class members.

155. Defendants, when aiding and assisting LinkedIn and Google's wiretapping and eavesdropping, intended to help LinkedIn and Google learn some meaning of the content in the URLs and the content the visitor requested.

156. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the LinkedIn Insight Tag and Google tracking technologies fall under the broad catch-all category of "any other manner":

a. The computer codes and programs LinkedIn and Google used to track Plaintiff Rusow and Class members' communications while they were navigating the Website;

b. Plaintiff Rusow's and Class members' browsers;

c. Plaintiff Rusow's and Class members' computing and mobile devices;

d. LinkedIn's and Google's web and ad servers;

e. The web and ad-servers from which LinkedIn and Google tracked and intercepted Plaintiff Rusow's and Class members' communications while they were using a web browser to access or navigate the Website;

f. The computer codes and programs used by LinkedIn and Google to effectuate its tracking and interception of Plaintiff Rusow's and Class members' communications while they were using a browser to visit the Website; and

g. The plan LinkedIn and Google carried out to effectuate their tracking and interception of Plaintiff Rusow's and Class members' communications while they were using a web browser or mobile device to visit the Website.

157. The information that Defendants transmitted using the LinkedIn Insight Tag and Google tracking technologies, including the appointment location, the type of procedure a patient is interested in, the specific procedure they want completed, the reason for the procedure, the provider they wish to see, the day, and time for the appointment constituted sensitive and confidential personally identifiable information.

158. As demonstrated hereinabove, Defendants violated CIPA by aiding and permitting third parties to receive its customers' sensitive and confidential online communications through the Website without their consent.

159. As a result of the above violations, Defendants are liable to Plaintiff Rusow and other members of the California Subclass in the amount of, the greater of, $5,000 dollars per violation or three times the amount of actual damages. Additionally, California Penal Code section 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

160. Under the statute, Defendants are also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendants in the future.

## COUNT III
## Violation of the California Confidentiality of Medical Information Act
## Cal. Civ. Code § 56.10

161. Plaintiff Rusow repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed California Subclass.

162. Under the California Confidentiality of Medical Information Act, California Civil Code section 56.10 ("CMIA"), providers of health care are prohibited from disclosing medical information relating to their patients without a patient's authorization. Medical information refers to:

> any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care . . . regarding a patient's medical history, mental or physical condition, or treatment. "Individually Identifiable" means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual . . . .

163. Plaintiff Rusow and Class members are patients under the definition of the CMIA because Plaintiff Rusow and Class members received "health care services from a provider of

health care" and the information Defendants shared to LinkedIn and Google was "medical information pertain[ing]" to Plaintiff Rusow and Class members. Cal. Civ. Code § 56.05(m).

164. Defendants are each a "provider of health care" as defined in California Civil Code section 56.05(o) because Defendants offer various cosmetic medical services. Defendants are also each considered a "provider of health care" under California Civil Code section 56.06, subdivisions (a) and (b), because Defendants' Website maintains medical information and offers software to consumers that is designed to maintain medical information for the purposes of allowing its users to manage their information or make the information available to a health care provider, of for the diagnoses, treatment, or management of a medical condition.

165. Therefore, as a provider of health care, Defendants are subject to the requirements of the CMIA and have an ongoing obligation to comply with the CMIA's requirements regarding the maintenance of its user's medical information.

166. As set forth hereinabove, the li_sugr and lms_ads cookies are identifiers sufficient to allow identification of an individual. Google utilizes similar user-IDs as well, in addition to utilizing Class member's IP addresses and device information to specifically identify each individual Class member with their Gmail account. Along with these cookies and other identifiers, Defendants disclosed to LinkedIn and Google several pieces of information regarding its patients' use of Defendants' Website, which, on information and belief, included, but was not limited to: patient medical conditions and treatment patients were seeking such as scheduling medical consultations searched for by patients.

167. This patient information was derived from a provider of health care regarding patients' medical treatment and physical condition. Accordingly, it constituted medical information pursuant to the CMIA.

168. As demonstrated hereinabove, Defendants failed to obtain its patients' valid authorization for the disclosure of medical information.

169. Pursuant to CMIA section 56.11, a valid authorization for disclosure of medical information must: (1) be "[c]learly separate from any other language present on the same page and is executed by a signature which serves no other purpose than to execute the authorization;" (2) be

signed and dated by the patient or her representative; (3) state the name and function of the third party that receives the information; and (4) state a specific date after which the authorization expires. Accordingly, information set forth in Defendants' Website Privacy Policy does not qualify as a valid authorization.

170. Based on the above, Defendants violated the CMIA by disclosing its patients' medical information to LinkedIn and Google.

171. Under the CMIA, a patient may recover compensatory damages, punitive damages not to exceed $3,000 dollars and attorneys' fees not to exceed $1,000, and the costs of litigation for any violating disclosure of medical information. Cal. Civ. Code §56.35. Alternatively, a patient may recover nominal damages of $1,000 for any negligent release of medical information. Cal. Civ. Code §56.36.

172. Pursuant to California Penal Code section 637.2, Plaintiff Rusow and Class members have been injured by the violations of California Penal Code section 635, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

## COUNT IV
## Invasion of Privacy Under California's Constitution

173. Plaintiff Rusow repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed California Subclass.

174. Plaintiff Rusow and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential online communications and protected health information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff Rusow's and Class members' knowledge or consent.

175. At all relevant times, by using the LinkedIn Insight Tag and Google tracking technologies to record and communicate patients' sensitive and confidential online medical

communications, Defendants intentionally invaded Plaintiff Rusow's and Class members' privacy rights under the California Constitution.

176. Plaintiff Rusow and Class members had a reasonable expectation that their sensitive and confidential online communications, identities, health information, and other data would remain confidential, and that Defendants would not install wiretaps on the Website.

177. Plaintiff Rusow and Class members did not authorize Defendants to record and transmit Plaintiff Rusow's and Class members' private medical communications alongside their personally identifiable health information.

178. This invasion of privacy was serious in nature, scope, and impact because it related to patients' private medical communications. Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

179. Accordingly, Plaintiff Rusow and Class members seek all relief available for invasion of privacy claims under California's Constitution.

**COUNT V**
**Violation of the Washington My Health My Data Act**
**RCW 19.373**

180. Plaintiff T.S. repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Washington Subclass.

181. Plaintiff T.S.'s privacy is a fundamental right and essential element of her individual freedom as recognized by Washington law.

182. Defendants are each a "[r]egulated entity" as defined by Wash. Rev. Code Ann. § 19.373.010(23).

183. As a natural person who is a resident of Washington, Plaintiff T.S. is a "[c]onsumer" as defined by Wash. Rev. Code Ann. § 19.373.010(7).

184. Defendants collected Plaintiff T.S.'s and Class members' consumer health data, including individual health conditions, treatment, diseases, or diagnosis; health-related surgeries or procedures; use or purchase of prescribed medication; precise location information that could

reasonably indicate a consumer's attempt to acquire or receive health services or supplies; and data that identifies a consumer seeking health care services.

185. Prior to harvesting and sharing Plaintiff T.S.'s personal data, Defendants never obtained consent. Nor did Defendants clearly and conspicuously disclose the categories of consumer health data collected or shared; the purpose of the collection or sharing or consumer health data; the categories of entities with whom the consumer health data is shared; and how the consumer can withdraw from future collection.

186. Plaintiff T.S. and members of the Washington Subclass seek all monetary and non-monetary relief allowed by law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

(a) For a determination that this action is a proper class action;

(b) For an order certifying the Classes, naming Plaintiffs as representatives of the Classes, and naming Plaintiffs' attorneys as Class Counsel to represent the Classes;

(c) For an order declaring that Defendants' conduct violates the statutes referenced herein;

(d) For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(e) An award of statutory damages to the extent available;

(f) For punitive damages, as warranted, in an amount to be determined at trial;

(g) For prejudgment interest on all amounts awarded;

(h) For injunctive relief as pleaded or as the Court may deem proper; and

(i) For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit.

**JURY TRIAL DEMANDED**

Plaintiffs, on behalf of themselves and the proposed Classes, demand a trial by jury for all of the claims asserted in this Complaint so triable.

Dated: April 2, 2025

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: *<u>/s/ Sarah N. Westcot</u>*

Sarah N. Westcot (State Bar No. 264916)
701 Brickell Ave., Suite 2100
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
Email: swestcot@bursor.com

*Counsel for Plaintiffs*