**BURSOR & FISHER, P.A.**
Sarah N. Westcot (State Bar No. 264916)
701 Brickell Avenue, Suite 2100
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
Email: swestcot@bursor.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KOURTNEY RUSOW, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SKINSPIRIT ESSENTIAL LLC,<br><br>Defendant. | Case No. 3:24-cv-09317-CRB<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Kourtney Rusow ("Plaintiff") brings this class action complaint on behalf of herself and all others similarly situated against Defendant SkinSpirit Essential LLC ("SkinSpirit" or "Defendant"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

**NATURE OF THE ACTION**

1. This is a class action lawsuit brought on behalf of all SkinSpirit patients who accessed https://www.skinspirit.com/ (the "Website") to schedule a consultation for medical treatment and/or services while in California.

2. Defendant operates "the premier destination for medical aesthetics and skincare"[1] providing an array of medical services and treatments to its patients, including various injectables, laser treatments, body contouring, and laser hair removal procedures. Defendant maintains an "expert staff of medical professionals" at each of its locations across more than a dozen states.[2]

3. When booking medical procedures online, patient privacy is crucial. Patients expect, as they should, that their information will be held in confidence and not shared with third parties without their knowledge or consent. The sensitive nature of information related to cosmetic medical procedures, such as those offered by Defendant, amplifies the need for privacy during online bookings. Medical procedures often involve deeply personal details about an individual's physical appearance, struggles with body image, and health history. This information can be emotionally charged and stigmatizing, making the protection of such data especially critical.

4. Moreover, information concerning an individual's healthcare, including medical procedures, is protected by state and federal law. Despite these protections, and unbeknownst to Plaintiff and Class Members, Defendant aided, employed, agreed, and conspired with LinkedIn and Google to intercept sensitive and confidential communications sent and received by Plaintiff and

---

[1] LINKEDIN, *SkinSpirit About*, https://www.linkedin.com/company/skinspirit-skincare-clinic-&-spa/about/.

[2] SKINSPIRIT, *Our Story*, https://www.skinspirit.com/skinspirit-company-story/.

Class Members, including communications containing protected medical information. Plaintiff brings this action for legal and equitable remedies resulting from these illegal actions.

**PARTIES**

5. Plaintiff Rusow is an adult citizen of the state of California, domiciled in San Francisco, California.

6. Plaintiff Rusow has maintained a LinkedIn and Gmail account at all relevant times when booking her medical appointments on the Website. When creating her LinkedIn and Gmail accounts, Plaintiff Rusow was required to provide her full legal name, date of birth, and gender. Additionally, every time Plaintiff Rusow accesses her Gmail account, Google collects information related to her IP address and electronic device (e.g. browser, operating system, screen resolution, etc.) and stores it in a profile maintained by Google for targeted advertising purposes. Google also utilizes other features, such as generating specific user-IDs, to track its users across web browsing sessions for identification purposes, as detailed below.

7. Plaintiff Rusow has booked several medical appointments through the Website using the same device and browser used to access her LinkedIn and Gmail accounts. Plaintiff Rusow attended her scheduled medical appointments and received medical treatment for the services she selected. For example, in or around May 12, 2023, Plaintiff Rusow navigated to Defendant's Website to book a medical consultation for Botox and laser treatment at Defendant's San Francisco Noe Valley location. During the booking process, Plaintiff Rusow selected the state she wished to book the appointment in, the type of procedure she was interested in, the specific procedure she wanted to have completed, the reason for the procedure, the provider she wished to see, the day, and time for her appointment. *See, e.g.,* Figures 2–6. Unbeknownst to Plaintiff Rusow, Defendant assisted LinkedIn and Google with intercepting her communications, including those that contained personally identifiable information ("PII"), protected health information ("PHI"), and related confidential information. Defendant assisted in these interceptions without Plaintiff Rusow's knowledge, consent, or express written authorization. As a consequence of these interceptions, Plaintiff Rusow has received advertisements marketing various cosmetic medical

procedures, specifically targeted at Plaintiff Rusow as a result of Defendant's disclosure of her medical booking information to LinkedIn and Google.

8. However, due to the surreptitious nature of the interceptions at issue, Plaintiff did not know (and had no way to know) the reason why she was receiving such targeted advertisements until contacting undersigned counsel in November 2024. Because the data interceptions occurred covertly and in real time while Plaintiff Rusow was navigating Defendant's website, Plaintiff had no viability into, nor any reasonable method of discovering the fact that her medical information was being simultaneously transmitted to third-party advertising platforms LinkedIn and Google. These transmissions were executed through hidden tracking tools that operate silently in the background of a webpage, without any meaningful disclosure to the user and without any affirmative action by the user that would reveal their presence.

9. As a result, although Plaintiff eventually observed that she was being served advertisements related to cosmetic medical procedures, it was impossible for her to discern the causal link between those ads and Defendant's unlawful disclosures. She had no technical capability to inspect the source of an advertisement, identify which entities received her data, or determine which specific interactions with a website triggered the targeted advertising algorithms. Advertising platforms do not disclose this information, and users cannot trace ad targeting decisions back to any particular website or data interception. Thus, Plaintiff could not have know, and had no reasonable way to know, that the ads she received were a direct consequence of Defendant's secret interception and dissemination of her PII and PHI until consulting with undersigned counsel in November 2024.

10. Moreover, the fact that Plaintiff received targeted advertisements is immaterial to Defendant's liability, as Defendant's unlawful conduct occured at the moment of interception and disclosure of Plaintiff's protected personal health information – regardless of whether or not the information Defendant incepted and disclosed was ultimately used for any future advertising. In other words, whether the third parties used Plaintiff's intercepted data to serve advertisements, ignored it entirely, or used it for some other purpose is irrelevant.

11. Defendant breached its duty of confidentiality by unlawfully disclosing Plaintiff Rusow's PII and PHI.

12. Defendant SkinSpirit Essential LLC is a Washington limited liability company with its principal place of business in Palo Alto, California. Defendant SkinSpirit Essential LLC owns and operates a national network of medical clinics specializing in a variety of cosmetic medical procedures. Defendant SkinSpirit Essential LLC maintains dozens of clinic locations throughout the United States, including within the State of California. Defendant SkinSpirit Essential LLC owns and operates the Website, whereby consumers seeking to procure medical procedures can schedule both virtual and in-person consultations for medical procedures, including at clinics located within California.

**JURISDICTION AND VENUE**

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than the Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000.00 exclusive of interest and costs.

14. This Court has personal jurisdiction over the parties because the parties reside in California. Further, Defendant has, at all times relevant hereto, systematically and continually conducted business in California, including within this District, and intentionally availed itself to the benefits and privileges of the California consumer market through the promotion, marketing, and sale of its services to residents within this District and throughout California

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant conducts substantial business in this District and Defendant SkinSpirit Essential LLC has its principal place of business is in this District.

**FACTUAL ALLEGATIONS**

**A. Background of the California Information Privacy Act**

16. The California Information Privacy Act ("CIPA"), California Penal Code § 630, *et seq.*, prohibits aiding or permitting another person to willfully—and without the consent of all

parties to a communication—read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received at any place within California.

17. To establish liability under California Penal Code § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

18. Section 631(a)'s applicability is not limited to phone lines, but also applies to "new technologies" including computers, the internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history).

19. Under California Penal Code § 637.2, Plaintiff Rusow may seek injunctive relief and statutory damages of $5,000 per violation.

**B. Background of the California Consumer Privacy Act**

20. Under California Consumer Privacy Act of 2018, Cal. Civ. Code § 1798.140, *et seq*. ("CCPA"), "[a] business that controls the collection of a consumer's personal information shall, at or before the point of collection, inform consumers of … [t]he categories of personal information to be collected and the purposes for which the categories of personal information are collected or used and whether that information is sold or shared. A business shall not collect additional categories of personal information or use personal information collected for additional purposes that are incompatible with the disclosed purpose for which the personal information was collected without providing the consumer with notice consistent with this section." (CCPA § 1798.100, subd. (a)(1).)

21. In addition, "[a] business that controls the collection of a consumer's personal information shall, at or before the point of collection, inform consumers of … [t]he length of time the business intends to retain each category of personal information, including sensitive personal information, or if that is not possible, the criteria used to determine that period provided that a business shall not retain a consumer's personal information or sensitive personal information for each disclosed purposes for which the personal information was collected for longer than is reasonably necessary for that disclosed purpose." (CCPA § 1798.100, subd. (a)(3)).

22. Under the CCPA, "[p]ersonal information" means "information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household. (CCPA § 1798.140, subd. (v)(1)). Personal information includes, but is not limited to, the following if it identifies, relates to, describes, is reasonably capable of being associated with, or could be reasonably linked, directly or indirectly, with a particular consumer or household. (*See id.*) That specifically includes "[c]ommercial information, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies." (*Id*. at subd. (v)(1)(D)).

23. In 2020, California passed the California Privacy Rights Act, which expands the protections afforded by the CCPA. This includes expanding the term "sensitive personal information" to include "the processing of biometric information collected and analyzed concerning a consumers' health." (*Id*. at subd. (ae)(2)(b)).

24. The PII and the services purchased at issue in this case are clearly "Personal information" under CCPA. Thus, Plaintiff and putative class members would reasonably have expected to be notified, as required by the CCPA, if Defendant intended to make available users' health data to third parties, at or before the collection of such data.

25. Yet Defendant never gave the requisite notice outlined above. Plaintiff and putative class members were wholly unaware of Defendant's transmission of users' data to LinkedIn and Google. They were likewise wholly unaware of LinkedIn Insight Tag and Google Analytics' monitoring and use of the same.

**C. LinkedIn's Platform and its Business Tools**

26. LinkedIn markets itself as "the world's largest professional network on the internet[.]"[3] But LinkedIn is no longer simply a tool to help users find jobs or expand their professional network. LinkedIn has moved into the marketing and advertising space and boasts of its ability to allow potential advertisers to "[r]each 1 billion+ professionals around the world" via its Marketing Solutions services.[4] Recently, LinkedIn was projected as being responsible for "roughly 0.9 percent of the global ad revenue" which included approximately $5.91 billion in advertising revenue in 2022.[5]

27. According to LinkedIn, "[t]argeting is a foundational element of running a successful advertising campaign — [g]etting your targeting right leads to higher engagement, and

---

[3] LINKEDIN, WHAT IS LINKEDIN AND HOW CAN I USE IT?, https://www.linkedin.com/help/linkedin/answer/a548441#.

[4] LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions.

[5] Valentina Dencheva, *LinkedIn annual ad revenue 2017-2027*, STATISTA (Dec. 12, 2023), https://www.statista.com/statistics/275933/linkedins-advertising-revenue.

ultimately, higher conversion rates."[6] Targeting refers to ensuring that advertisements are targeted to, and appear in front of, the target demographic for an advertisement. To that end, LinkedIn's Marketing Solutions services allow potential advertisers to "[b]uild strategic campaigns" targeting specific users.[7] LinkedIn's "marketing solutions allow advertisers to select specific characteristics to help them reach their ideal audience. The ads [users] see on LinkedIn are then targeted to provide content relevant to [the users]."[8]

28. As a result of its activities and operation of the LinkedIn Insight Tag, LinkedIn is able to make extremely personal inferences about individuals' demographics, intent, behavior, engagement, interests, buying decisions, and more.[9]

29. The personal information and communications obtained by LinkedIn are used to fuel various services offered via LinkedIn's Marketing Solutions including Ad Targeting, Matched Audiences, Audience Expansion, and LinkedIn Audience Network.[10]

30. Such information is extremely valuable to marketers and advertisers because the inferences derived from users' personal information and communications allows marketers and advertisers, including healthcare providers and insurance companies, to target potential customers.[11]

---

[6] LINKEDIN, REACH YOUR AUDIENCE: TARGETING ON LINKEDIN, p.3, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/resources/pdfs/linkedin-targeting-playbook-v3.pdf.

[7] LINKEDIN, *supra* note 5.

[8] LINKEDIN, LINKEDIN ADS AND MARKETING SOLUTIONS, https://www.linkedin.com/help/lms/answer/a421454.

[9] *See* LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions/audience ("Target audiences through demographic marketing[,]" "Zero in on intent, behavior, engagement, interests, and more[,]" and "Reach the LinkedIn audience involved in the buying decision").

[10] *See id.*

[11] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy ("We serve you tailored ads both on and off our Services. We offer you choices regarding personalized ads, but you cannot opt-out of seeing other ads."); LINKEDIN, ACCOUNT TARGETING, https://business.linkedin.com/marketing-solutions/ad-targeting ("Target your ideal customer based on traits like their job title, company name or industry, and by professional or personal interests"); LINKEDIN, EXAMPLES OF TRENDING AND BEST-IN-CLASS HEALTHCARE CAMPAIGNS AND CONTENT, p.6, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/healthcare-microsite/resources/lkin-lms-sales-healthcare-campaigns-trending-content-Jan2023.pdf ("BD

31. For example, through the use of LinkedIn's Audience Network, marketers and advertisers are able to expand their reach and advertise on sites other than LinkedIn to "reach millions of professionals across multiple touchpoints."[12] According to Broc Munro of Microsoft, "[w]e gravitate towards social platforms like LinkedIn to achieve more targeted marketing engagement. However, we know that our audiences don't spend all their time on social media. LinkedIn Audience Network enables us to expand our reach to trusted sites while still respecting our audience targeting. This increases the impact of our advertising."[13]

32. In July 2022, "LinkedIn Marketing Solutions surpassed $5 billion in annual revenue[.]"[14] That figure is "expected to further grow to reach 10.35 billion U.S. dollars by 2027."[15]

33. According to LinkedIn, the LinkedIn Insight Tag is "[a] simple code snippet added to [a] website [that] can help you optimize your campaigns, retarget your website visitors, and learn more about your audiences."[16] LinkedIn represents that the LinkedIn Insight Tag "enable[s] in-depth campaign reporting and unlock[s] valuable insights about your website visitors."[17]

34. LinkedIn's current iteration of its Insight Tag is a JavaScript-based code which allows for the installation of its software.[18] A critical feature allows the LinkedIn Insight Tag to

---

zeroed in on the end-benefit with a 30 second video introducing their PIVO needle-free blood collection device to potential customers."); LINKEDIN, HEALTHCARE SOCIAL MEDIA STRATEGIES FOR 2023, p.1, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/healthcare-microsite/resources/hc-social-media-trends.pdf (listing "potential customers" as "Common audiences" for insurance sector).

[12] LINKEDIN, ACCOUNT TARGETING, https://business.linkedin.com/marketing-solutions/ad-targeting.

[13] LINKEDIN, LINKEDIN AUDIENCE NETWORK, https://business.linkedin.com/marketing-solutions/native-advertising/linkedin-audience-network.

[14] *LinkedIn Business Highlights from Microsoft's FY22 Q4 Earnings*, LINKEDIN PRESSROOM (July 25, 2022), https://news.linkedin.com/2022/july/linkedin-business-highlights-from-microsoft-s-fy22-q4earnings#:~:text=And%20LinkedIn%20Marketing%20Solutions%20surpassed,revenue%20for%20the%20first%20time.

[15] Dencheva, *supra* note 6.

[16] LINKEDIN, INSIGHT TAG, https://business.linkedin.com/marketing-solutions/insight-tag.

[17] LINKEDIN, LINKEDIN INSIGHT TAG FAQS, https://www.linkedin.com/help/lms/answer/a427660.

[18] LINKEDIN, *supra* note 17.

track users, even when third-party cookies are blocked.[19] LinkedIn "recommend[s] using the JavaScript-based Insight Tag or Conversions API" because third-party cookie settings are being deprecated across the industry.[20] Embedding the JavaScript as a first-party cookie causes users' browsers to treat the LinkedIn Insight Tag as though it is offered by the website being visited, rather than by LinkedIn. Doing so ensures that the third-party cookie-blocking functions of modern web browsers do not prevent LinkedIn from collecting data through its software.[21] Instead, the LinkedIn Insight Tag is shielded with the same privacy exemptions offered to first-party cookies.

35. When a user who has signed in to LinkedIn (even if the user subsequently logs out) is browsing a website where the LinkedIn Insight Tag has been embedded, an HTTP request is sent using cookies, which includes information about the user's actions on the website.

36. These cookies also include data that differentiate users from one another and can be used to link the data collected to the user's LinkedIn profile.

37. The HTTP request about an individual who has previously signed into LinkedIn includes requests from the "li_sugr" and "lms_ads" cookies. Each of these cookies are used by LinkedIn "to identify LinkedIn Members off LinkedIn" for advertising purposes.[22]

38. For example, the "li_sugr" cookie is "[u]sed to make a probabilistic match of a user's identity."[23] Similarly, the "lms_ads" cookie is "[u]sed to identify LinkedIn Members off LinkedIn for advertising."[24]

39. A LinkedIn profile contains information including an individual's first and last name, place of work, contact information, and other personal details. Based on information it

---

[19] *Id.* ("It's important for advertisers to prepare for these changes by switching to JavaScript tags and enabling 'enhanced conversion tracking' in the Insight Tag settings to continue capturing signals where 3rd party cookies are blocked.").

[20] *See id.*

[21] *See id.*

[22] LINKEDIN, LINKEDIN COOKIE TABLE, https://www.linkedin.com/legal/l/cookie-table.

[23] *See id.*

[24] *See id.*

obtains through the LinkedIn Insight Tag, which Defendant installed on the Website, LinkedIn is able to target its account holders for advertising.

40. LinkedIn never receives consent from users to intercept and collect electronic communications containing their sensitive and unlawfully disclosed information. In fact, LinkedIn expressly warrants the opposite. Similarly, Defendant never received consent from users to share information with LinkedIn.

41. When first signing up, a user agrees to the User Agreement.[25] By using or continuing to use LinkedIn's Services, users agree to two additional agreements: the Privacy Policy[26] and the Cookie Policy.[27]

42. LinkedIn's Privacy Policy begins by stating that "LinkedIn's mission is to connect the world's professionals . . . . Central to this mission is our commitment to be transparent about the data we collect about you, how it is used and with whom it is shared."[28]

43. The Privacy Policy goes on to describe what data LinkedIn collects from various sources, including cookies and similar technologies.[29] LinkedIn states "we use cookies and similar technologies (e.g., pixels and ad tags) to collect data (e.g., device IDs) to recognize you and your device(s) on, off and across different services and devices where you have engaged with our Services. We also allow some others to use cookies as described in our Cookie Policy."[30]

44. However, LinkedIn offers an express representation: "**We will only collect and process personal data about you where we have lawful bases.**"[31]

45. Users never choose to provide sensitive information to LinkedIn because, among other reasons, they never know whether a particular website uses the LinkedIn Insight Tag, and, if so, what sensitive personal data it collects.

---

[25] LINKEDIN, USER AGREEMENT, https://www.linkedin.com/legal/user-agreement.

[26] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy.

[27] LINKEDIN, COOKIE POLICY, https://www.linkedin.com/legal/cookie-policy.

[28] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy.

[29] *Id.*

[30] *Id.*

[31] *Id.* (emphasis added).

**D. Google's Advertising Technology**

46. Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications. Each device (such as a computer, tablet, laptop, or smartphone) accesses web content through a web browser (e.g. Chrome, Safari, Edge, etc.).

47. Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with the consumer's device via web browsers.

48. Web communications consist of HTTP Requests and HTTP Responses and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

a. HTTP Request: an electronic communication sent from a device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

b. Cookies: a small text file that can be used to store information on the device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

c. HTTP Response: an electronic communication that is sent as a reply to the device's web browser from the host server in response to a HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

49. A consumers' HTTP Request essentially asks the Website to retrieve certain information (such as appointment booking information), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the consumer's screen as they navigate the Website).

50. Every website is comprised of Markup and "Source Code." Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

51. Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. The tracking technologies embedded on the Website by Defendant constitute Source Code and function is a substantially similar way.

52. Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $1 trillion dollars. Google fancies itself a "tech" company, but Google, at its core, is an advertising company.

53. Google "make[s] money" from "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising."[32] In 2020, Google generated $146.9 billion in advertising revenue, which amounted to more than 80 percent of Google's total revenues for the year. Google generated an even higher percentage of its total revenues from advertising in prior years:

**Figure 1:**

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|---|---|---|---|
| 2021 | $257.6 billion | $209.5 | 81.33% |
| 2020 | $182.5 billion | $146.9 billion | 80.49% |
| 2019 | $161.9 billion | $134.8 billion | 83.29% |
| 2018 | $136.8 billion | $116.5 billion | 85.12% |

54. Google offers several analytics products, including SDKs and a tracking pixel, which exist solely to help drive ad revenue. For instance, Google's SDK and pixel integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue. Products like Google's SDK and its tracking pixel also improve the company's advertising network and capabilities by providing more wholesome profiles and data points on individuals.

55. One of these SDKs and tracking pixels is Google Analytics. Google first launched a version of Google Analytics in 2005 as a tool for website traffic analysis. In 2007, Google

[32] ALPHABET INC., ANNUAL REPORT (FORM 10-K) (Feb. 2, 2021), available at https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

launched Google Analytics Synchronous code with new tracking functionality, such as the ability to track commerce transactions. Two years later, Google launched the Google Analytics Asynchronous code, which allowed webpages to load faster and improved data collection and accuracy.

56. Google continued updating its analytics platform, launching Universal Analytics in 2012. Universal Analytics offered new tracking codes and tools that provided more in-depth information about user behavior. Also, Universal Analytics enabled tracking the same user across multiple devices through its addition of the User-ID feature, which "associate[s] a persistent ID for a single user with that user's engagement data from one or more sessions initiated from one or more devices."

57. In 2020, Google launched Google Analytics 4, a platform combining Google Analytics with Firebase to analyze both app and web activity.

58. Since launching Google Analytics, Google has become one of the most popular web analytics platforms on the internet. Indeed, Google had a $62.6 billion increase in advertising revenues in 2021, compared to 2020, after launching its most recent version of Google Analytics.

59. Google touts Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms."[33] It allows companies and advertisers that utilize it to "understand how your customers interact across your sites and apps, throughout their entire lifestyle," "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data," "take action to optimize marketing performance with integrations across Google's advertising and publisher tools," and "quickly analyze your data and collaborate with an easy-to-use interface and shareable reports."[34]

60. Google Analytics is incorporated into third-party websites and apps, including the Website, by adding a small piece of JavaScript measurement code to each page on the site—even when SkinSpirit users are logged into their account portals. This code immediately intercepts a

---

[33] *Analytics*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last visited Jan. 10, 2023).

[34] *Id.*

user's interaction with the webpage every time the user visits it, including what pages they visit and what they click on. The code also collects PII, such as IP addresses and device information related to the specific computing device a consumer (or patient) is using to access a website. The device information intercepted by Google includes the patient's operating system, operating system version, browser, language, and screen resolution.

61. In other words, when interacting with the Website, an HTTP Request is sent to SkinSpirit's server, and that server sends an HTTP Response including the Markup that displays the website visible to the patient and Source Code, including Google's tracking technologies.

62. Thus, Defendant is essentially handing its patients a tapped device, and once the webpage is loaded onto the patient's browser, the software-based wiretap is quietly waiting for private communications on the Website to trigger the tap, which intercepts those communications intended only for Defendant and transmits those communications to third parties like Google.

63. Once Google's software code collects the data intercepted from the Website, it packages the information and sends it to Google Analytics for processing. Google Analytics enables the company or advertiser to customize the processing of the data, such as applying filters. Once the data is processed, it is stored on a Google Analytics database and cannot be changed.

64. After the data has been processed and stored in the database, Google uses this data to generate reports to help analyze the data from the webpages. These include reports on acquisition (e.g., information about where your traffic originates, the methods by which users arrive at your site or app, and the marketing efforts you use to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits, and demographics (e.g., classify your users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities).

65. In addition to using the data collected through Google Analytics to provide marketing and analytics services, Google also uses the data collected through Google Analytics to improve its ad targeting capabilities and data points on users.

66. Google Analytics links with Google Ads so that Google may use the data intercepted by Google Analytics to be utilized for targeted advertising purposes.[35] Such practices were in effect on the SkinSpirit Website at all relevant times.

67. The Website utilizes Google's pixel and SDK. As a result, Google intercepted patients' interactions on the Website, including their PII and PHI. Google received at least "Custom Events" and URLs that disclosed the Botox treatment being received by the patient. Google also received additional PII, including the patients' IP address, device information, and User-IDs.

68. For example, the Website utilizes Google's "cid" or "Client ID" function to identify users as they navigate the SkinSpirit Website.[36]

69. In addition to user-IDs, upon receiving information from the Website, Google also utilizes a "browser-fingerprint" to personally identify consumers. A browser-fingerprint is information collected about a computing device that is used to identify the specific device.

70. These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data.

71. As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[37]

72. The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[38] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

---

[35] https://support.google.com/analytics/answer/9379420?hl=en#zippy=%2Cin-this-article

[36] https://www.owox.com/blog/use-cases/google-analytics-client-id#:~:text=The%20Client%20ID%20(cid)%20or,unique%20users%20using%20this%20parameter.

[37] https://www.blog.google/products/chrome/building-a-more-private-web/

[38] https://www.pixelprivacy.com/resources/browser-fingerprinting/

73. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[39]

74. Browser-fingerprints are personal identifiers. Tracking technologies, like the ones developed by Google and utilized on the Website, can collect browser-fingerprints from website visitors.

75. Google, as enabled by Defendant, collects vast quantities of consumer data through its tracking technology.

76. Due to the vast network of consumer information held by Google, it is able to match the IP addresses, device information, and user-IDs it intercepts and link such information to an individual's specific identity.

77. Google then utilizes such information for its own purposes, such as targeted advertising.

### E. Defendant Disclosed Plaintiff's and Class Members' Protected Health Information

78. Botox treatment is surging in popularity. In 2022, the global Botox industry was valued at over $6 billion.[40] By 2030, the global market is expected to exceed $15 billion.

79. The cosmetic treatments and services offered by Defendant are recognized as medical procedures in California.[41]

80. Defendant's patients access the Website to book consultations and appointments for various medical procedures.

81. When accessing the Website, patients are required to create an account in order to schedule their medical appointments.

---

[39] https://ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/

[40] Botox Market Growth, Values, Analysis [2030] | The Brainy Insights, https://www.thebrainyinsights.com/report/botox-market-13252#:~:text=Market%20Introduction.

[41] https://facialesthetics.org/california-botox-training-requirements/#:~:text=In%20California%2C%20obtaining%20Botox%20certification,are%20classified%20as%20medical%20procedures. ("In California, obtaining Botox certification is essential for medical professionals who wish to legally administer Botox or other botulinum toxins, as these treatments are classified as medical procedures.").

82. After creating their accounts, patients click a book now button on the Website, which allows them to pick which state they would like to book their consultation in. *See* Figs 2-3.




**Figure 2:** Screenshot of Defendant's Website with pixel interceptions overlayed

83. Unbeknownst to SkinSpirit's patients, LinkedIn and Google were tracking their activity the moment they entered the Defendant's Website.




**Figure 3**: Screenshot of Defendant's Website with pixel interceptions overlayed

84. For example, Defendant embedded the LinkedIn Insight Tag on the Website, which allowed LinkedIn to intercept and record "click" events. Click events detail information about which page on the Website the patient was viewing as well as the selections they were making. LinkedIn intercepts information including the state the patient is booking the appointment in, the type of procedure they were interested in, the specific procedure they wanted to have completed, the reason for the procedure, the provider they wished to see, the day, and time for the patient's appointment. *See* Figures 2–6.




**Figure 4:** Screenshot of Defendant's Website with pixel interceptions overlayed




**Figure 5:** Screenshot of Defendant's Website with pixel interceptions overlayed




**Figure 6:** Screenshot of Defendant's Website with pixel interceptions overlayed

85. By installing the LinkedIn Insight Tag on the Website, Defendant disclosed its patients PII and PHI to LinkedIn related to their medical appointments in order to monetize that data for targeted advertising

86. As shown in Figures 3 through 6, LinkedIn intercepts several pieces of confidential information, including the state the appointment is in, the type of procedure a patient is interested in, the specific procedure they want completed, the reason for the procedure, the provider they wish to see, the day, and time for the appointment.

87. These interceptions also included the li_sugr and lms_ads cookies, which LinkedIn utilizes to identify its account holders for targeted advertising.

88. LinkedIn incorporated the information it intercepted from Defendant's Website into its marketing tools to fuel its targeted advertising service.

89. Similarly, during the appointment booking process, Defendant disclosed its patients' PII and PHI to Google as well. *See e.g.* Fig. 7.

▾ Query String Parameters view source view URL-encoded
v: 2
tid: G-TPX9GJNM6C
gtm: 45je4ae0v9118221732za200
_p: 1729095915154
gcd: 131313131111
npa: 0
dma: 0
tag_exp: 101686685
gdid: dZTQ1Zm
cid: 1097504560.1729095915
ul: en-us
sr: 3072x1728
uaa: x86
uab: 64
uafvl: Google%20Chrome;129.0.6668.103|Not%3DA%3FBrand;8.0.0.0|Chromium;129.0.6668.103
uamb: 0
uam:
uap: Windows
uapv: 15.0.0
uaw: 0
are: 1
pae: 1
frm: 0
pscdl: noapi
_s: 6
cu: USD
sid: 1729095915
sct: 1
seg: 1
dl: https://skinspirit.zenoti.com/webstoreNew/services/928596c7-6929-44de-be94-e500ebb50e06?fx_sid=a39393de-b12a-4a27-a338-506ca5248202&fx_uid=
87ede7a-7a3d-4b10-9aa2-8e7225bdfb63&fx_gaId=GA1.1.252323256.1729095874&fx_s=direct&fx_m=direct&__hstc=220057542.93a7792c76329247bcd7c3249dee8a
c.1729095864719.1729095864719.1729095864719.1&__hssc=220057542.4.1729095864719&__hsfp=1896627464&_gl=1*1ogfklu*_gcl_au*MjA5MDgxNzI0Ny4xNzIzNDA
Njc0LjM3ODAzOTk3MS4xNzI3NzMyMjkyLjE3Mjc3MzIyOTI.*_ga*MTI0MzU5NzQ5Mi4xNzAwNjg1NzEw*_ga_TPX9GJNM6C*MTcyODg0MTEwNi4xNDUuMS4xNzI4ODQzMjQ4LjU2LjAuM
A..
dr: https://www.skinspirit.com/
dt: skinspirit - Online Booking - Services - Booking Summary
en: purchase
_c: 1
_ee: 1
pr1: id993915a7-c537-4963-9bbb-08803f746b40~nmBotox Hyperhidrosis 100 Units~lp1~qt1~pr1475
ep.transaction_id: 68e00e2c-8130-429e-a14a-fe9edc5c3f73
ep.affiliation: Webstore Store - Online
ep.value: 1475.00
ep.tax: 0.00
epn.shipping: 0
ep.center_id: 928596c7-6929-44de-be94-e500ebb50e06
ep.center_name: Los Gatos
ep.is_new_guest: true
_et: 2223
tfd: 156689

**Figure 7:** Screenshot of information intercepted through Google's tracking technologies on Defendant's Website

90. When patients' book a medical appointment for Botox treatment, Defendant intercepts information related to its patients' appointments through Google's tracking technologies, including the city the appointment is in, the type of procedure a patient is interested in, the specific procedure they want completed, the reason for the procedure.

91. Defendant further discloses to Google the PII of its patients' sufficient for Google to uncover patient identities. In the HTTP communications shown in Figure 7, the patients' IP address is inherently included in every network request. In addition to their patients' IP address, Defendant, through Google's tracking technologies, disclosed information about their specific devices and user-IDs to Google, allowing Google to link such information to an individual's specific identity.

92. As shown and described above, Plaintiff's communications with Defendant were disclosed by Defendant to Google and/or intercepted in transit by Google, in real time, via detailed URLs, which contain the medically sensitive information entered into the Website.

93. Defendant also used and caused the disclosure of data sufficient for Google to create a browser-fingerprint identifier with each re-directed communication described herein, including patient communications concerning individual medical appointments.

94. Defendant sent out these identifiers (e.g. cid, IP address, and device information) with each patient's "event" data.

95. Plaintiff never consented, agreed, authorized, or otherwise permitted LinkedIn or Google to intercept her confidential health information.

96. Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to share her confidential health information. Such disclosures are an invasion of privacy, lead to harassing targeted advertising, and violating federal and state law.

97. By law, Plaintiff is entitled to privacy in her protected health information and confidential communications. Defendant deprived Plaintiff of her privacy rights when Defendant implemented a system that surreptitiously tracked and recorded Plaintiff's and other online consumers' confidential communications, personally identifiable information, and protected health information.

**F. Plaintiff's Private Information has Financial Value**

98. Plaintiff's and Class Members' PII and PHI have value, and Defendant's disclosure and interception harmed Plaintiff and Class Members by not compensating them for the value of their PII and PHI and, in turn, decreasing the value of their PII and PHI.

99. Tech companies are under particular scrutiny because they already have access to a massive trove of information about people, which they use to serve their own purposes, including potentially micro-targeting advertisements to people with certain health conditions.

100. The value of personal data is well understood and generally accepted as a form of currency. It is now incontrovertible that a robust market for this data undergirds the tech economy.

101. The robust market for Internet user data has been analogized to the "oil" of the tech industry.[42] A 2015 article from TechCrunch accurately noted that "[d]ata has become a strategic asset that allows companies to acquire or maintain a competitive edge."[43] That article noted that the value of a single Internet user—or really, a single user's data—varied from about $15 to more than $40.

102. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data (after costs).[44] That figure is only due to keep increasing; estimates for 2022 were as high as $434 per user, for a total of more than $200 billion industry wide.

103. Professor Paul M. Schwartz, writing in the Harvard Law Review, notes: "Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." [45]

---

[42] *See* https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data

[43] *See* https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/

[44] *See What Your Data is Really Worth to Facebook* (July 12, 2019), https://washingtonmonthly.com/2019/07/12/what-your-data-is-really-worth-to-facebook/

[45] Paul M. Schwartz, *Property, Privacy, and Personal Data*, 117 Harv. L. Rev. 2055, 2056-57 (2004).

104. This economic value has been leveraged largely by corporations who pioneered the methods of its extraction, analysis, and use. However, the data also has economic value to Internet users. Market exchanges have sprung up where individual users like Plaintiff herein can sell or monetize their own data. For example, Nielsen Data and Mobile Computer will pay Internet users for their data.[46]

105. There are countless examples of this kind of market, which is growing more robust as information asymmetries are diminished through revelations to users as to how their data is being collected and used.

106. Courts recognize the value of personal information and the harm when it is disclosed without consent.[47]

107. Healthcare data is particularly valuable on the black market because it often contains all of an individual's PII and medical conditions as opposed to a single piece of information that may be found in a financial breach.

108. Healthcare data is incredibly valuable because, unlike a stolen credit card that can be easily canceled, most people are unaware that their medical information has been sold. Once it has been detected, it can take years to undo the damage caused.

109. The value of health data is well-known and various reports have been conducted to identify its value.

110. Specifically, in 2023, the Value Examiner published a report entitled Valuing Healthcare Data. The report focused on the rise in providers, software firms and other companies that are increasingly seeking to acquire clinical patient data from healthcare organizations. The

[46] *See 10 Apps for Selling Your Data for Cash*, https://wallethacks.com/apps-for-selling-your-data/

[47] *See, e.g., In re Facebook Privacy Litig.*, 572 F. App'x 494, 494 (9th Cir. 2014) (holding that Plaintiff's allegations that they were harmed by the dissemination of their personal information and by losing the sales value of that information were sufficient to show damages for their breach of contract and fraud claims); *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) (recognizing "the value that personal identifying information has in our increasingly digital economy").

report cautioned providers that they must de-identify data and that purchasers and sellers of "such data should ensure it is priced at fair market value to mitigate any regulatory risk."[48]

111. Trustwave Global Security published a report entitled The Value of Data. With respect to healthcare data records, the report found that they may be valued at up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[49]

112. The value of health data has also been reported extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry," in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[50]

113. Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[51]

114. The dramatic difference in the price of healthcare data compared to other forms of private information commonly sold is evidence of the value of PHI.

115. These rates are assumed to be discounted because they do not operate in competitive markets, but rather, in an illegal marketplace. If a criminal can sell other Internet users' stolen data, surely Internet users can sell their own data.

116. In short, there is a quantifiable economic value to Internet users' data that is greater than zero. The exact number will be a matter for experts to determine.

117. Defendant shared Plaintiff's and Class Members' communications and transactions on its Website without permission.

---

[48] *See* https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcare%20Data.pdf

[49] *See* https://www.imprivata.com/blog/healthcare-data-new-prize-hackers (citing https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf).

[50] *See* https://time.com/4588104/medical-data-industry/

[51] *See* https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html

118. The unauthorized access to Plaintiff's and Class Members' PII and PHI has diminished the value of that information, resulting in harm to Defendant's patients, including Plaintiff and Class Members.

119. Plaintiff has a continuing interest in ensuring that her future communications with Defendant are protected and safeguarded from future unauthorized disclosure.

**G. Tolling**

120. Any applicable statutes of limitations have been tolled by Defendant's knowing and active concealment of its incorporation of the LinkedIn Insight Tag and Google tracking technologies onto the SkinSpirit Website.

121. The LinkedIn Insight Tag and Google tracking technologies are entirely invisible to a website visitor.

122. Through no fault or lack of diligence, Plaintiff and members of the putative class were deceived and could not reasonably discover Defendant's deceptive and unlawful conduct.

123. Plaintiff was ignorant of the information essential to pursue her claims, without any fault or lack of diligence on her part. Plaintiff only became aware of the disclosure of her health information due to the investigation of undersigned counsel just prior to filing her complaint.

124. Defendant had exclusive knowledge that the SkinSpirit Website incorporated the LinkedIn Insight Tag and Google tracking technologies and yet failed to disclose to their patients, including Plaintiff, that by scheduling medical appointments through the Website, their PHI and PII would be disclosed to LinkedIn and Google.

125. Deciphering the invisible network traffic of a website requires the use of sophisticated technology not known or understood by the average consumer, nor is it reasonable that the average consumer would be expected to inspect the complex and invisible network traffic of every website they visit.

126. Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its patients PII and PHI. In fact, to the present, Defendant has not conceded, acknowledged, or otherwise indicated to their patients

that they have disclosed or released their PII or PHI to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

127. Moreover, all applicable statutes of limitations have also been tolled pursuant to the discovery rule.

128. The earliest that Plaintiff, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of the initial complaint in this matter.

## CLASS ACTION ALLEGATIONS

129. Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of a class defined as all persons in California who, during the class period, had a LinkedIn or Gmail account and booked an appointment on www.skinspirit.com (the "Class").

130. Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate.

131. The "Class Period" is the time beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

132. Excluded from the Class is Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer, director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his/her spouse and immediate family members; and members of the judge's staff.

133. Numerosity. Members of the Class are so numerous that joinder of all members is impracticable. The exact number of Class Members is unknown to Plaintiff at this time; however, it is estimated that there are at least thousands of individuals in the Class. The identity of such membership is readily ascertainable from Defendant's records.

134. Typicality. Plaintiff's claims are typical of the claims of the Class because Plaintiff used the Website to schedule a medical appointment and had her personally identifiable

information and protected health information disclosed to LinkedIn and Google without her express written authorization or knowledge. Plaintiff's claims are based on the same legal theories as the claims of other Class members.

135. Adequacy. Plaintiff is prepared to take all necessary steps to represent fairly and adequately the interests of the Class members. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation, generally, and in the emerging field of digital privacy litigation, specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Class.

136. Commonality. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Class include:

a. Whether Defendant intentionally tapped the lines of internet communication between patients and their healthcare provider;

b. Whether the Website surreptitiously recorded personally identifiable information, protected health information, and related communications and subsequently, or simultaneously, disclosed that information to LinkedIn and/or Google;

c. Whether LinkedIn and Google are third-party eavesdroppers;

d. Whether Defendant's disclosures of personally identifiable information, protected health information, and related communications constituted an affirmative act of communication;

e. Whether Defendant's conduct, which allowed LinkedIn and Google—each an unauthorized person—to view Plaintiff's and Class members' personally identifiable information and protected health information, resulted in a breach of confidentiality;

f. Whether Defendant violated Plaintiff's and Class members' privacy rights by using

the LinkedIn Insight Tag and Google tracking technologies to record and communicate patients' confidential medical communications;

g. Whether Plaintiff and Class members are entitled to damages under the CIPA, or any other relevant statute; and

h. Whether Defendant's actions violated Plaintiff's and Class members' privacy rights as provided by the California Constitution.

137. Superiority. Class action treatment is the superior method for the fair and efficient adjudication of this controversy. Such treatment permits a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh any potential difficulties in the management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the California Invasion of Privacy Act, Cal. Penal Code § 631

138. Plaintiff Rusow repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of all members of the proposed Class.

139. The California Invasion of Privacy Act ("CIPA") is codified at California Penal Code sections 630 to 638. CIPA begins with its statement of purpose – namely, that the purpose of CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . ." Cal. Penal Code § 630.

140. A person violates California Penal Code § 631(a), if:

> by means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . . .

Cal. Penal Code § 631(a).

141. Further, a person violates Section 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph. *Id.*

142. To avoid liability under Section 631(a), a defendant must show it had the consent of **<u>all</u>** parties to a communication.

143. At all relevant times, Defendant aided, agreed with, and conspired with LinkedIn and Google to track and intercept Plaintiff Rusow's and Class members' internet communications while accessing the Website. These communications were intercepted without the authorization and consent of Plaintiff Rusow and Class members.

144. Defendant, when aiding and assisting LinkedIn and Google's wiretapping and eavesdropping, intended to help LinkedIn and Google learn some meaning of the content in the URLs and the content the visitor requested.

145. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the LinkedIn Insight Tag and Google tracking technologies fall under the broad catch-all category of "any other manner":

a. The computer codes and programs LinkedIn and Google used to track Plaintiff Rusow and Class members' communications while they were navigating the Website;

b. Plaintiff Rusow's and Class members' browsers;

c. Plaintiff Rusow's and Class members' computing and mobile devices;

d. LinkedIn's and Google's web and ad servers;

e. The web and ad-servers from which LinkedIn and Google tracked and intercepted Plaintiff Rusow's and Class members' communications while they were using a web browser to access or navigate the Website;

f. The computer codes and programs used by LinkedIn and Google to effectuate its tracking and interception of Plaintiff Rusow's and Class members' communications while they were using a browser to visit the Website; and

g. The plan LinkedIn and Google carried out to effectuate their tracking and interception of Plaintiff Rusow's and Class members' communications while they were using a web browser or mobile device to visit the Website.

146. The information that Defendant transmitted using the LinkedIn Insight Tag and Google tracking technologies, including the appointment location, the type of procedure a patient is interested in, the specific procedure they want completed, the reason for the procedure, the provider they wish to see, the day, and time for the appointment constituted sensitive and confidential personally identifiable information.

147. As demonstrated hereinabove, Defendant violated CIPA by aiding and permitting third parties to receive its customers' sensitive and confidential online communications through the Website without their consent.

148. As a result of the above violations, Defendant is liable to Plaintiff Rusow and other members of the Class in the amount of, the greater of, $5,000 dollars per violation or three times the amount of actual damages. Additionally, California Penal Code section 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

149. Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

**COUNT II**
**Violation of the California Invasion of Privacy Act,**
**Cal. Penal Code § 632**

150. Plaintiff Rusow repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of all members of the proposed Class.

151. Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication.

152. Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

153. The data collected on Defendant's Website constitutes "confidential communications," as that term is used in Section 632, because class members had an objectively reasonable expectation of private with respect to their personally identifiable information.

154. Plaintiff and Class Members expected their communications to Defendant to be confined to Defendant in part, because of Defendant's consistent representations that these communications would remain confidential. Plaintiff and Class Members did not expect third parties, and specifically LinkedIn and Google, to secretly eavesdrop upon or record this information and their communications.

155. The Tracking Technologies from Third Parties, are all electronic amplifying or recording devices for purposes of § 632.

156. By contemporaneously intercepting and recording Plaintiff's and Class members' confidential communications to Defendant through this technology, the Third Parties eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

157. At no time did Plaintiff or Class members consent to Defendant or LinkedIn or Google's conduct, nor could they reasonably expect that their communications to Defendant would be overheard or recorded by LinkedIn or Google.

158. LinkedIn and Google utilized Plaintiff's and Class members' personally identifiable information for their own purposes, including advertising and analytics.

159. Defendant is liable for aiding violations of Section 632 by LinkedIn and Google.

160. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Members of the California Subclass have been injured by the violations of Cal. Penal Code § 632, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

## COUNT III
## Invasion of Privacy Under California's Constitution

161. Plaintiff Rusow repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of all members the proposed Class.

162. Plaintiff Rusow and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential online communications and protected health information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff Rusow's and Class members' knowledge or consent.

163. At all relevant times, by using the LinkedIn Insight Tag and Google tracking technologies to record and communicate patients' sensitive and confidential online medical communications, Defendant intentionally invaded Plaintiff Rusow's and Class members' privacy rights under the California Constitution.

164. Plaintiff Rusow and Class members had a reasonable expectation that their sensitive and confidential online communications, identities, health information, and other data would remain confidential, and that Defendant would not install wiretaps on the Website.

165. Plaintiff Rusow and Class members did not authorize Defendant to record and transmit Plaintiff Rusow's and Class members' private medical communications alongside their personally identifiable health information.

166. This invasion of privacy was serious in nature, scope, and impact because it related to patients' private medical communications. Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

167. Accordingly, Plaintiff Rusow and Class members seek all relief available for invasion of privacy claims under California's Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a) For a determination that this action is a proper class action;

(b) For an order certifying the Class, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(c) For an order declaring that Defendant's conduct violates the statutes referenced herein;

(d) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(e) An award of statutory damages to the extent available;

(f) For punitive damages, as warranted, in an amount to be determined at trial;

(g) For prejudgment interest on all amounts awarded;

(h) For injunctive relief as pleaded or as the Court may deem proper; and

(i) For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiff, on behalf of herself and the proposed Class, demands a trial by jury for all of the claims asserted in this Complaint so triable.

Dated: November 14, 2025

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: /s/ Sarah N. Westcot

Sarah N. Westcot (State Bar No. 264916)
701 Brickell Ave., Suite 2100
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
Email: swestcot@bursor.com

*Counsel for Plaintiff*